**ORAL ARGUMENT NOT SCHEDULED**

**No. 14-5182**

IN THE

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Pharmaceutical Research and Manufacturers of America,
Appellant

v.

Federal Trade Commission,
Appellee

Appeal from the United States District Court
for the District of Columbia, No. 1:13-CV-01974(BAH)

---

**PRINCIPAL BRIEF FOR APPELLANT**

---

Aaron M. Streett
Shane Pennington
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Wm. Bradford Reynolds
Joseph A. Ostoyich
James F. Rill
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., NW
Washington, DC 20004
(202) 639-7700

Evan A. Young
*Counsel of Record*
BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Austin, TX 78701
(512) 322-2506

---

*Counsel for Appellant Pharmaceutical Research and Manufacturers of America*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.     Parties and Amici**

Appellant:

Pharmaceutical Research and Manufacturers of America ("PhRMA"): a trade association headquartered in Washington, DC.

Appellee:

The Federal Trade Commission ("FTC")

Amici before this Court: None.

**B.    Rulings Under Review**

The ruling under review is Judge Beryl A. Howell's May 30, 2014, Final Judgment in favor of FTC.  JA 361.  The district court's published memorandum opinion granting summary judgment for the agency and denying PhRMA's motion for summary judgment is Joint Appendix 291-360 and may be found in the Federal Supplement at *Pharmaceutical Research and Manufacturers of America v. Federal Trade Commission*, ___ F. Supp. 2d ___ (D.D.C. 2014).

**C.    Related Cases**

None.

/s/ Evan A. Young
Evan A. Young
BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Austin, TX 78701
(512) 322-2506

Dated: November 10, 2014

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, PhRMA states that it is a trade association with no parent corporation and with no publicly-held company owning 10 percent or more of its stock. PhRMA's member companies are listed on its website at http://www.phrma.org.

/s/ Evan A. Young
Evan A. Young
Baker Botts L.L.P.
98 San Jacinto Blvd.
Austin, TX 78701
(512) 322-2506

Dated:  November 10, 2014

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ........................................ iii

TABLE OF CONTENTS........................................................... iv

TABLE OF AUTHORITIES ..................................................... vii

GLOSSARY....................................................................xv

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF THE ISSUES.......................................................2

STATEMENT OF THE CASE.........................................................3

I.      The statutory background.................................................3

II.     The rulemaking process and PhRMA's challenge to the Final Rule..............5

        A.     FTC's proposed Rule expands HSR Act coverage, but only for
               the pharmaceutical industry......................................5

        B.     PhRMA opposes the proposed Rule with expert evidence .................7

        C.     FTC promulgates the Final Rule .........................................8

        D.     The Final Rule imposes a heavy burden on the pharmaceutical
               industry .......................................................9

        E.     The district court upholds the Final Rule .............................11

SUMMARY OF ARGUMENT ......................................................13

STANDARD OF REVIEW .........................................................16

ARGUMENT ....................................................................17

I.      The Final Rule cannot survive *Chevron* scrutiny .........................18

A.  The HSR Act withholds statutory authority for FTC to single out the pharmaceutical industry for special reporting burdens ..........18

   1.  The HSR Act's plain text precludes FTC's claim of authority .....19

      a. Section 18a(a)'s "no person" command forecloses FTC's singling out of the pharmaceutical industry.............................19

      b. Section 18a(a)'s "exempt[ion]" provision forecloses FTC's interpretation ..........................................................................20

      c. The district court ignored the HSR Act's plain language.........22

   2.  The HSR Act's context confirms that Congress withheld FTC authority to impose coverage on a single industry ......................23

      a. The broader statutory scheme and the structure of the HSR Act demonstrate that Congress did not authorize FTC to impose the notification requirements on an industry-specific basis..............................................................................................24

      b. FTC cannot use its authority to define terms or adopt "necessary and appropriate" rules to distort the HSR Act's structure...............................................................................25

   3.  The HSR Act's legislative history contradicts FTC's interpretation ..................................................................................29

B.  The Rule merits no deference because it is unreasonable and contradicts the agency's own longstanding construction of the HSR Act.........................................................................................34

   1.  The district court misapplied the *Chevron* Step Two analysis......35

   2.  FTC's assertion of power it has long disclaimed further highlights the unreasonableness of its interpretation...................37

II.  The Rule is invalid because it is arbitrary and capricious ............................39

A.    The Rule springs not from reasoned decisionmaking based on record evidence but from shallow invocation of FTC "experience"....................................................................39

   1.  FTC offered no reasoned basis for departing from its own longstanding views.......................................................41

   2.  FTC's appeals to its own expertise cannot justify the Final Rule ...............................................................44

B.    FTC failed to examine (or even provide) relevant data to make a rational connection from record-based facts to the Rule................47

   1.  The exclusive-patent-license filings and informal database do not supply a reasoned explanation for the Rule............................48

   2.  FTC wrongly assumes that the pharmaceutical industry deserves targeted regulation because it has sought informal guidance from the agency ............................................................53

   3.  FTC did not provide a meaningful response to the substantial problems with the Final Rule that Dr. Varner raised....................55

C.    This Court should vacate the Final Rule ...............................................58

CONCLUSION ....................................................................60

CERTIFICATE OF COMPLIANCE....................................................................61

CERTIFICATE OF SERVICE ....................................................................62

# TABLE OF AUTHORITIES[1]

Page(s)

## CASES

*Adams Fruit Co. v. Barrett,*
  494 U.S. 638 (1990)............................................................35

*Adirondack Med. Ctr. v. Sebelius,*
  740 F.3d 692 (D.C. Cir. 2014)..........................................34

*Allied-Signal, Inc. v. NRC,*
  988 F.2d 146 (D.C. Cir. 1993)..........................................59

*Am. Bar Ass'n v. FTC,*
  430 F.3d 457 (D.C. Cir. 2005)..........................35, 36, 37

*Am. Bus. Ass'n v. Slater,*
  231 F.3d 1 (D.C. Cir. 2000)..............................................22

*Am. Petroleum Inst. v. EPA,*
  52 F.3d 1113 (D.C. Cir. 1995)..........................................29

*Am. Petroleum Inst. v. EPA,*
  684 F.3d 1342 (D.C. Cir. 2012)........................................17

*Am. Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008)..........................50, 52, 53

*Arizona Pub. Serv. Co. v. EPA,*
  211 F.3d 1280 (D.C. Cir. 2000)..................................23, 34

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012)..........................................16

*Barnhart v. Sigmon Coal Co.,*
  534 U.S. 438 (2002)..........................................................22

*Barnhart v. Walton,*
  535 U.S. 212 (2002)..........................................................36

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962)...........................................................................44

*Bus. Roundtable v. SEC*,
   647 F.3d 1144 (D.C. Cir. 2011).........................................................55

*Catawba County v. EPA*,
   571 F. 3d 20 (D.C. Cir. 2009)............................................................23

*Chamber of Commerce v. SEC*,
   443 F.3d 890 (D.C. Cir. 2006).......................................................48, 59

*\*Chevron U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984).................. 13, 15, 16, 17, 18, 19, 23, 27, 34, 35, 36, 37, 41

*City of Arlington v. FCC*,
   133 S. Ct. 1863 (2013).......................................................................19

*County of Los Angeles v. Shalala*,
   192 F.3d 1005 (D.C. Cir. 1999).........................................................47

*Eagle Broad. Grp., Ltd. v. FCC*,
   563 F.3d 543 (D.C. Cir. 2009)..........................................................27

*Emory v. United Air Lines, Inc.*,
   720 F.3d 915 (D.C. Cir. 2013)..........................................................27

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)..........................................................................24

*Fin. Planning Ass'n v. SEC*,
   482 F.3d 481 (D.C. Cir. 2007)..........................................................37

*Fox v. Clinton*,
   684 F.3d 67 (D.C. Cir. 2006)...........................................................17

*Friedman v. Sebelius*,
   686 F.3d 813 (D.C. Cir. 2012).......................................................34, 35

*Gonzales v. Oregon*,
   546 U.S. 243 (2006)..........................................................................26

*Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*,
    706 F.3d 499 (D.C. Cir. 2013)............................................................34

*In re Sealed Case*,
    237 F.3d 657 (D.C. Cir. 2001)............................................................35

*Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading
Comm'n*,
    887 F. Supp. 2d 259 (D.D.C. 2012).....................................................16

*La. Fed. Land Bank Ass'n v. Farm Credit Admin.*,
    336 F.3d 1075 (D.C. Cir. 2003)...........................................................55

*Loving v. IRS*,
    742 F.3d 1013 (D.C. Cir. 2014)...........................................24, 37, 38, 39

*Manin v. Nat'l Transp. Safety Bd.*,
    627 F.3d 1239 (D.C. Cir. 2011)...........................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................46, 47

*Muwekma Ohlone Tribe v. Salazar*,
    708 F.3d 209 (D.C. Cir. 2013).............................................41, 46, 47

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
    734 F.3d 1115 (D.C. Cir. 2013).............................................23, 44, 57

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008)............................................................59

*NRDC v. EPA*,
    489 F.3d 1250, 1258 (D.C. Cir. 2007).....................................26, 27, 28

*NRDC v. EPA*,
    749 F.3d 1055 (D.C. Cir. 2014).............................................28, 29, 36, 37

*Pers. Watercraft Indus. v. Dep't of Commerce*,
    48 F.3d 540 (D.C. Cir. 1995)..............................................................47, 48

*Portland Cement Ass'n v. Ruckelshaus*,
    486 F.2d 375 (D.C. Cir. 1973)............................................................50

ix

*PPL Wallingford Energy, LLC v. FERC*,
   419 F.3d 1194 (D.C. Cir. 2005) ........................................................... 17

*PSEG Energy Res. & Trade LLC v. FERC*,
   665 F.3d 203 (D.C. Cir. 2011) ............................................................... 55

*Pub. Media Ctr. v. FCC*,
   587 F.2d 1322 (D.C. Cir. 1978) ..................................................... 44, 57

*Roberts v. Sea-Land Servs., Inc.*,
   132 S. Ct. 1350 (2012) .......................................................................... 24

*Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*,
   29 F.3d 655 (D.C. Cir. 1994) (*en banc*) ........................................ 36, 37

*SecurityPoint Holdings, Inc. v. Transp. Security Admin.*,
   No. 13-1068, Slip op. (D.C. Cir. Oct. 28, 2014) ......................... 52, 57

*Sorenson Commc'ns Inc. v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014) ............................................................... 46

*Tourus Records, Inc. v. DEA*,
   259 F.3d 731 (D.C. Cir. 2001) ............................................................... 17

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and
   Explosives*,
   437 F.3d 75 (D.C. Cir. 2006) ................................................................ 17

*W. Deptford Energy, LLC v. FERC*,
   766 F.3d 10 (D.C. Cir. 2014) ............................................ 41, 42, 43, 44, 59

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ............................................................................... 26

**STATUTES**

5 U.S.C. § 552(a)(2) ................................................................................ 51

5 U.S.C. § 701. ........................................................................................... 1

5 U.S.C. § 706(2)(A) ......................................................................... 16, 17

5 U.S.C. § 706(2)(C) ............................................................................... 16

5 U.S.C. § 706(2)(D) ................................................................58

15 U.S.C. § 18 ..........................................................................8

*15 U.S.C. § 18a ..........................................3, 13, 23, 25, 30, 37

15 U.S.C. § 18a(a) ...................... 2, 3, 12, 13, 19, 20, 22, 23, 34

15 U.S.C. § 18a(a)(1) ..............................................................4

15 U.S.C. § 18a(a)(2) ..............................................................4

15 U.S.C. § 18a(b)(1) ............................................................11

15 U.S.C. § 18a(c) .............................................4, 13, 19, 21, 23, 31

15 U.S.C. § 18a(c)(6) ........................................................24, 25

15 U.S.C. § 18a(d)(1) ...........................................................4, 28

15 U.S.C. § 18a(d)(2) ..............................................................4

15 U.S.C. § 18a(d)(2)(B) ................................4, 7, 20, 21, 30

15 U.S.C. § 18a(d)(2)(C) ........................................................28

15 U.S.C. § 18a(e) ................................................................11

15 U.S.C. § 18a(e)(1) ..............................................................5

15 U.S.C. § 18a(e)(2) ..............................................................5

15 U.S.C. § 21 ..........................................................................8

15 U.S.C. § 41 ........................................................................32

15 U.S.C. § 717t-2(a)(1) ........................................................24

28 U.S.C. § 1291 .....................................................................1

28 U.S.C. § 1331 .....................................................................1

47 U.S.C. § 521(4) ................................................................24

49 U.S.C. §10706(a)(2)(A) ...................................................24

49 U.S.C. § 11321(a) ...............................................................................24

49 U.S.C. § 11324 ...................................................................................24

49 U.S.C. § 41308 ...................................................................................24

**LEGISLATIVE HISTORY**

122 Cong. Rec. 29,342 (1976) ................................................................30

122 Cong. Rec. H8,169 (1976) ...............................................................31

122 Cong. Rec. H10,290 (Sept. 16, 1976)...............................................31

122 Cong. Rec. H10,294 (Sept. 16, 1976)...........................................31, 33

122 Cong. Rec. S15,417 (Sept. 8, 1976)............................................30, 32, 33

122 Cong. Rec. S15,420 (Sept. 8, 1976)..................................................31

H.R. 14,580, 94th Cong. (1976) .............................................................30

H.R. 14,580, 94th Cong., § 7A(a) (1976) ...............................................31

H.R. 14,580, 94th Cong., § 7A(b) (1976) ...............................................31

H.R. 14,580, 94th Cong., § 7A(c) (1976) ...............................................31

H.R. Rep., No. 94-1373 (1976).............................................................3, 45

S. 1284, 94th Cong. (1975) ..............................................................29, 31

S. 1284, 94th Cong., 2d Sess. 68 (May 6, 1976) ....................................33

S. 1284 94th Cong., § (b)(3) (1975).......................................................30

S. Rep., No. 94-803 (1976) .....................................................................3

S. 1284, 94th Cong., § 102(a)(5) (1975)..............................................29, 30

**OTHER AUTHORITIES**

16 C.F.R. § 801 ........................................................................................4

16 C.F.R. § 801.1 .....................................................................................5

16 C.F.R. § 801.2 ................................................................................5, 6

16 C.F.R. § 802 ...................................................................................4

16 C.F.R. § 803 ...................................................................................4

43 Fed. Reg. 33,485 ...........................................................................38

43 Fed. Reg. 33,496 ...............................................................38, 39, 47

43 Fed. Reg. 33,450 (July 31, 1978)..................................................25

43 Fed. Reg. 33,488 (July 31, 1978)............................................25, 57

52 Fed. Reg. 20059 (1987) ................................................................45

77 Fed. Reg. 50,057 ...........................................................................56

77 Fed. Reg. 50,059 ...........................................................................58

78 Fed. Reg. 68,710 ...........................................................................12

79 Fed. Reg. 3814 ..............................................................................4

ABA Section of Antitrust Law, Premerger Notification Practice Manual (4th
    ed. 2007) ....................................................................................51

About Informal Interpretations, available at
    http://www.ftc.gov/enforcement/premerger-notification-program/
    informal-interpretations/about-informal-interpretations. ..................49

About Informal Interpretations, available at
    http://www.ftc.gov/es/node/126268. ........................................51, 52

Anne K. Bingaman, The Role of Antitrust Intellectual Property (June 16,
    1994), available at http:www.justice.gov/atr/public/speeches/0112.htm...........39

APEC-OECD Integrated Checklist on Regulatory Reform at 6, available at www.oecd.org/regreform/34989455.pdf ...........................................................39

Comments of the Section of the Antitrust Law, ABA, in Response to the Antitrust Modernization Commission's Request for Public Comment Regarding the HSR Second Request Process (2006) ...............................................11

Federal Trade Commission, FTC Premerger Notification Introductory Guides, ¶42,502 Introductory Guide II (2014), 2010 WL 293202 .....................25

Filing Fee Information, available at http://www.ftc.gov/enforcement/ premerger-notification-program/filing-fee-information. ....................................10

Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 757 (1982) ..............46

Gregory L. Kinzelman, *United States v. Malone*: Lessons for HSR Practitioners on Premerger Notification Office Informal Interpretations, Antitrust Source at 5 (Feb. 2010) ...............................................................52

Hart-Scott-Rodino Annual Report, Fiscal Year 2012, at 6, available at http://www.ftc.gov/sites/default/files/documents/reports_annual/35th-report-fy2012/130430hsrreport_0.pdf. .......................................................10, 11

Hart-Scott-Rodino Annual Report Fiscal Year 2013, available at http://www.ftc.gov/system/files/documents/reports/36th-report-fy2013/ 140521hsrreport.pdf ...............................................................................50

Horizontal Merger Data Fiscal Years 1996-2011, at 8-10, available at http://www.ftc.gov/sites/default/files/documents/reports/horizontal-merger-investigation-data-fiscal-years-1996-2011/130104horizontalmergerreport.pdf ............................................................54

Remarks of Commissioner Julie Brill, Antitrust and Innovation: Rebalancing the Scale (Sept. 14, 2013), available at http://www.ftc.gov/sites/default/ files/documents/public_statements/antitrust-and-innovation-rebalancing-scale/130914iba_0.pdf ...............................................................................54

Webster's Third New International Dictionary 795 (1981) ....................................21

## **GLOSSARY**

| | |
|---|---|
| Antitrust agencies | The Antitrust Division of the Department of Justice and the Federal Trade Commission |
| APA | Administrative Procedure Act |
| DOJ | Department of Justice |
| FTC | Federal Trade Commission |
| HSR Act | Hart-Scott-Rodino Act |
| NPR | Notice of Proposed Rulemaking |
| PhRMA | Pharmaceutical Research and Manufacturers of America |
| PNO | Premerger Notification Office |

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the United States District Court for the District of Columbia that disposed of all parties' claims. PhRMA sought to set aside an FTC Final Rule under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* The district court, which had jurisdiction under 28 U.S.C. § 1331, granted summary judgment for FTC, denied PhRMA's motion for summary judgment, and entered final judgment on May 30, 2014. PhRMA timely appealed on July 25, 2014. JA 362. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.   The Hart-Scott-Rodino Antitrust Improvements Act of 1976 established a premerger notification and waiting-period requirement for all mergers and acquisitions above certain size thresholds that Congress viewed as having the potential to violate the antitrust laws.  The Act mandates that "no person shall" evade that requirement "[e]xcept as exempted."  15 U.S.C. § 18a(a).

     Did FTC violate the HSR Act by promulgating an unprecedented final rule that selectively imposes the notification and waiting-period requirements on all persons in the pharmaceutical industry proposing certain transactions but on no persons in other industries proposing identical transactions?

2.   Did FTC act arbitrarily and capriciously in promulgating the Final Rule on the strength of only a bare, unsubstantiated reference to its "experience" and "expertise" without providing any reasoned justification or credible evidence to support its action?

2

## STATEMENT OF THE CASE

PhRMA challenges an FTC Final Rule promulgated under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act" or "Act"). The Rule marks the first time in the statute's thirty-seven year history that FTC has singled out one industry—here the pharmaceutical industry—for regulation.

## I.     The statutory background

The HSR Act addressed a problem of timing and remedies. Correcting large, potentially anticompetitive mergers and acquisitions after the fact can be difficult because the acquired firm loses its independent identity, and "[u]nscrambling the merger and restoring the acquired firm to its former status as an independent competitor is difficult at best, and frequently impossible." H.R. Rep. No. 94-1373, at 8 (1976).

Congress responded to that problem by enacting the HSR Act's pre-merger notification and waiting-period requirements, under which FTC and the Antitrust Division of the Department of Justice ("the antitrust agencies") can undertake advance review of mergers and acquisitions of a certain size that Congress regarded as having the potential to violate the antitrust laws. § 18a;[2] *see also* S. Rep. No. 94-803, at 1 (1976); H.R. Rep. No. 94-1373, at 5 (1976). Section 18a(a) imposes the Act's notification requirement broadly on all persons proposing trans-

---

[2] Unless otherwise indicated, citations to statutory provisions are to the HSR Act as codified in Title 15 of the U.S. Code.

actions that meet § 18a(a)(1)-(2)'s coverage requirements.[3]  It provides a blanket rule that "[e]xcept as exempted pursuant to subsection (c) of this section, no person shall" enter into a covered transaction without first notifying the antitrust agencies and waiting a specified period of time.  Subsection (c) provides twelve discrete exemptions, the last of which applies to "classes of persons, acquisitions, transfers, or transactions" that FTC determines "are not likely to violate the antitrust laws."  *See* §§ 18a(c), 18a(d)(2)(B).

The HSR Act allows FTC to promulgate rules that "(A) define the terms used in this section; (B) exempt, from the requirements of this section, classes of persons, acquisitions, transfers, or transactions which are not likely to violate the antitrust laws; and (C) prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section."  § 18a(d)(2); *see also* 16 C.F.R. §§ 801-803.  The third category instructs the antitrust agencies to ensure that the requisite notifications are "in such form and contain such documentary material and information" as is "necessary and appropriate" to enable them to determine whether the proposed acquisition may, if consummated, violate the antitrust laws. § 18a(d)(1).  The antitrust agencies may make "second requests," requiring "addi-

---

[3] Sections 18a(a)(1) and (2) establish a three-part test to determine whether a given transaction is subject to the HSR Act's notification requirements; most mergers and acquisitions valued at over $75.9 million (subject to annual adjustment under § 18a(a)(2)) are covered.  *See* 2014 Revised Jurisdictional Thresholds for Section 7A of the Clayton Act, 79 Fed. Reg. 3814 (thresholds effective Feb. 24, 2014).

tional information" and extending the 30-day waiting period to review particular transactions.  § 18a(e)(1)-(2).

## II.     The rulemaking process and PhRMA's challenge to the Final Rule

### A.     FTC's proposed Rule expands HSR Act coverage, but only for the pharmaceutical industry

On August 20, 2012, FTC published a "Notice of Proposed Rulemaking Regarding Certain Licensing Transactions in the Pharmaceutical Industry" ("NPR").  JA 5-10.  The NPR proposed imposing notification burdens on patent-rights transfers where "the licensor retains the right to manufacture exclusively for the licensee," but only for persons in the pharmaceutical industry.  JA 8.

The NPR proposed amending 16 C.F.R. § 801.1 to define three terms that appear nowhere in the HSR Act: "all commercially significant rights," "limited manufacturing rights," and "co-rights."  JA 9.  It further proposed amending 16 C.F.R. § 801.2 (coverage rules for "acquiring and acquired persons") to confine the new notification requirements to the pharmaceutical industry.  *Id.*

FTC acknowledged that the targeted transactions occur in other industries.  JA 7 (advising parties in other industries undertaking targeted transactions to consult with the Premerger Notification Office ("PNO")).  It nonetheless claimed that these license agreements in the pharmaceutical industry were, "in the PNO's experience, unlike [those] seen in any other industry."  *Id.*  Nowhere does the NPR disclose the nature of the alleged "PNO's experience" or explain how such transac-

tions in the pharmaceutical industry are "unlike" those in other industries such that the former should be covered and the latter not. It justified selective coverage only by asserting that the pharmaceutical industry has "unique incentives for the use of exclusive licenses" and that, in that industry, "the right to manufacture is far less important than the right to commercialize." *Id.*

The NPR further maintained, again without backup, that the targeted licenses occur more frequently in the pharmaceutical industry than elsewhere, but did not explain how that was relevant to the rulemaking or the HSR Act's purposes generally. *Id.* Nor did FTC consider that its own historic scrutiny of the pharmaceutical industry might prompt practitioners representing pharmaceutical interests to double- and triple-check their assessment of agency guidance on transaction reportability with PNO staff. It simply asserted an unknown number of unnamed "practitioners" purportedly seeking informal agency guidance on unidentified "exclusive licenses in the pharmaceutical industry," without revealing any particulars about the nature of the alleged requests, or their volume, frequency, content, or sources. *Id.*

While "limit[ing the proposed rule] to the pharmaceutical industry," the NPR simultaneously advised "parties dealing with exclusive rights to a patent in other industries" to consult the agency because the same transactions arising in other industries somehow "remain[] potentially reportable." *Id.* FTC nowhere ex-

6

plained the necessity of selectively imposing coverage, with its attendant costs and delays, on the pharmaceutical industry when the targeted transactions are potentially reportable regardless of industry.

### B.    PhRMA opposes the proposed Rule with expert evidence

PhRMA timely filed written comments objecting to the proposed Rule.  *See* JA 12-58.  PhRMA explained that imposing the notification requirement on transactions in one industry but not others violated the HSR Act's mandate that "no person shall" evade the notification requirement.  JA 12-16.  It observed that the agency nowhere purported to exercise its limited § 18a(d)(2)(B) exemption authority, and that, in any event, such authority would not permit the proposed industry carve-out.  JA 15.  PhRMA also argued that the proposed Rule violated the APA because FTC failed to provide a reasoned basis, supported by credible evidence, for targeting the pharmaceutical industry.  JA 13, 17-26.  Because the exclusive-licensing transactions occur in other industries, PhRMA argued that it was arbitrary to impose the notification requirement on the pharmaceutical industry alone.  JA 13, 20-21.  It also observed that the proposed Rule would materially increase the number of HSR Act filings from pharmaceutical companies, causing substantial expense, uncertainty, and transaction delay.  JA 13, 24-25.

PhRMA also objected that FTC's reliance on unexplained claims of agency "expertise" violated the APA.  JA 19.  The Clayton Act allows the antitrust

7

agencies to investigate even non-reportable transactions, *see* §§ 18, 21 (§§ 7 and 11 of the Clayton Act, making anticompetitive acquisitions illegal and giving agencies the authority to enforce that proscription)—yet the NPR did not show that the anti-trust agencies had ever challenged, tried to unwind, or otherwise regarded as anti-competitive a single license of the type the rule targeted.  Moreover, PhRMA submitted the report of Dr. Thomas R. Varner, an expert economist, who reviewed thousands of licensing transactions in a wide range of industries and found that the targeted transactions are hardly unique to the pharmaceutical industry.  JA 27-58. He also explained why FTC was wrong to believe that manufacturing is less important in the pharmaceutical industry than elsewhere and that the pharmaceutical industry has any unique incentive to use exclusive patent licenses.  JA 33-38, 42-46.

### C.    FTC promulgates the Final Rule

On November 6, 2013, FTC issued the Final Rule as proposed.  It was published in the Federal Register on November 15, 2013, and became effective on December 16, 2013.  JA 74-82.  FTC admitted that the exclusive licenses the Rule regulates were not reportable "under PNO staff's prior approach."  JA 79.  FTC addressed PhRMA's comments only summarily.  It disclaimed "expanding the HSR requirements to parties or transactions not covered by the Act," insisting it was "simply clarifying" that it *now* considered the newly-covered licenses reporta-

ble when the licensor and licensee are persons in the pharmaceutical industry.  JA 78.

FTC distanced itself from the NPR's principal justifications for targeting the pharmaceutical industry.  Confronted with Dr. Varner's evidence, the Commission abandoned its unique-incentives rationale, claiming that "[t]he rule is limited to the pharmaceutical industry not because of the uniqueness of the incentives in that industry but because it is the only industry to the PNO's knowledge in which exclusive patent licenses are prevalent."  JA 77-78.  It similarly backed off the NPR's assertion that manufacturing is less important in the pharmaceutical industry than elsewhere, claiming it only intended to explain "why the PNO sees exclusive patent licenses in the pharmaceutical industry . . . more and more frequently without the transfer of manufacturing right."  JA 77.

Like the NPR, the Final Rule neither acknowledged nor explained FTC's shift in policy that prompted, for the first time ever, singling out one industry for additional regulation.  Nor did it identify any antitrust concerns that justified the selective coverage expansion.  Indeed, FTC disclaimed any responsibility to provide such an explanation.  JA 78 n.24.

### D.    The Final Rule imposes a heavy burden on the pharmaceutical industry

FTC estimates that the Final Rule will require thirty additional HSR Act filings in the pharmaceutical industry annually, at an aggregate annual cost ex-

9

ceeding $1,000,000. JA 81. PhRMA explained that the true costs will likely be substantially higher. JA 24-26. The filing fee alone is between $45,000 and $280,000 per transaction, depending on transaction size. *See* Filing Fee Information, available at http://www.ftc.gov/enforcement/premerger-notification-program/filing-fee-information. Thus, FTC's estimate of thirty additional filings a year would impose on the industry an annual *minimum* of $1,350,000, ranging up to $8,400,000. JA 25. The higher number is more likely; as FTC acknowledges, pharmaceutical licensing transactions tend to "incur[] a filing fee at the higher end" of the per-transaction range. JA 125 (Def't's Answer ¶ 82).

Further, licensors and licensees incur significant costs in preparing HSR notification forms. JA 25. Average costs range from $40,000 and $60,000 per party—lower for straightforward transactions and higher for more complex transactions (often exceeding $100,000). *See* JA 72 (PhRMA Letter to FTC Commissioner Wright at 2 (June 7, 2013)). Thirty additional notifications means at least sixty separate notification forms, at an average annual expense ranging from roughly $2,400,000 to $3,600,000 (60 forms at $40,000 to $60,000 each). *See* JA 81.

FTC's analysis shows that 2.5% to 5% of transactions receive second requests under § 18a(e)(1)-(2),[4] and recent information demonstrates that the anti-

---

[4] *See* Hart-Scott-Rodino Annual Report, Fiscal Year 2012, at 6, available at

trust agencies issued second requests in 8% of reportable transactions in the chemical (including pharmaceutical) manufacturing industries.  JA 31.  Second requests impose substantial additional fees for legal and economic analysis.  In 2006, the American Bar Association estimated that compliance with an average second request costs about $5 million, rising to $20 million for very complex transactions.  Comments of the Section of the Antitrust Law, ABA, in Response to the Antitrust Modernization Commission's Request for Public Comment Regarding the HSR Second Request Process (2006), at 4.

The Rule will also introduce considerable delay, uncertainty, and expense for previously unreportable pharmaceutical licensing transactions because of the initial mandatory waiting period, § 18a(b)(1), and the possibility of further postponement upon a second request, § 18a(e).  The ability to quickly consummate licenses designed to speed beneficial medicines to market could only be detrimentally affected.

### E.      The district court upholds the Final Rule

PhRMA sought to have the district court set aside the Final Rule raising the same arguments it made in its comments to the NPR.  The district court upheld the Final Rule.  It acknowledged the Act's blanket "no person" mandate, but found it "too thin a reed" on which to disqualify the Final Rule, "given the broader

http://www.ftc.gov/sites/default/files/documents/reports_annual/35th-report-fy2012/130430hsrreport_0.pdf.

language granting the FTC rulemaking and exemption authority." JA 321. According to the district court, "FTC's definitional authority is not restricted to bar selective application of regulations, but rather gives the agency a blank slate to define . . . terms." JA 324 (internal quotation marks omitted). In addition to that "blank slate," the district court contended that because FTC possessed "broad exemption authority," it "could have achieved the same purpose reflected in the Final Rule by issuing a generally applicable rule that exempted all industries other than the pharmaceutical industry on the basis that similar transactions in other industries do not pose an antitrust threat." JA 328. Concluding that strict adherence to § 18a(a)'s "no person" mandate would "elevate form . . . over substance," *id.*, the district court held that "FTC's issuance of an industry-specific rule is not foreclosed by the words 'no person' . . . when contextual examination of this provision reveals such varied and open-ended exemptions also authorized by Congress." JA 324.

The district court also found FTC's explanation for the Final Rule sufficient. It contended that the agency "justified limiting the rule by stating that, generally, agencies 'need not take an all-or-nothing approach . . . [but] may proceed incrementally' when rulemaking." JA 342 (quoting 78 Fed. Reg. at 68,710). The district court explained that "FTC has similarly supported its incremental approach with a sensible reason—the agency's lack of experience with patent rights

transfers outside the pharmaceutical industry." JA 343. It was not troubled by FTC's failure to identify the particulars of, or circumstances surrounding, the unidentified "filings" or requests for informal guidance. The court rationalized that requiring FTC to produce the evidence that it claimed justified the Rule "would be unwieldy, particularly where there is no indication that the FTC transcribes" its interactions with HSR Act practitioners. JA 348. And, it said, "informal interpretations the PNO produces in response to requests for interpretation from practitioners are publicly available and searchable on the FTC's website." JA 352.

PhRMA timely appealed. JA 362.

## SUMMARY OF ARGUMENT

I.A.   FTC's Rule targets the pharmaceutical industry alone and is therefore predicated on an asserted authority that conflicts with § 18a's plain text. Under *Chevron* Step One, the district court should have invalidated the Rule.

The HSR Act imposes its notification requirements universally for suspect transactions across all industries and provides that "no person shall" evade those requirements. § 18a(a). In the same breath, Congress announced that if FTC finds a sufficient basis to conclude that otherwise-covered "persons" and "transactions" pose minimal risk of an antitrust violation, FTC can "exempt[]" them from coverage. § 18a(c). What the Act forecloses is FTC's *imposing* the reporting obligations selectively on particular industries. The district court wrongly disregarded

13

this carefully drawn congressional line, reasoning that, by giving the FTC the pow-

er to exempt "classes of persons," Congress silently gave the FTC the opposite

power as well—the power to impose the notification requirements on an industry-

specific basis.  But this ignores the plain meaning of "exempt," which allows FTC

to *relieve* those few found to present no antitrust threat from the notice require-

ments imposed, not to discriminatorily *impose* burdens on one class while leaving

unburdened all others similarly situated.  Tellingly, not even FTC sought to justify

its Rule as nothing more than a back-handed exemption.

      I.B.    Statutory context supports the plain meaning.  The HSR Act is

part of a complex antitrust statutory scheme that includes many industry-specific

laws.  It even accounts for these industry-specific statutes by exempting industries

from HSR's notification burden when transactions in a given industry are already

subject to independent antitrust review.  Congress knew how to create an industry-

specific statute when it wrote the Act, but instead intentionally created a law of

general applicability.  Likewise, the Act's structure is inconsistent with FTC au-

thority to target an industry.  Congress imposed the notification requirement com-

prehensively to ensure that suspect transactions, wherever proposed, are spotted

before taking effect; it left room only to exempt those few specifically found to

present no antitrust threat.  The Rule flouts this core structure, whether character-

ized as a narrow *imposition* on some but not others or as a broad *exemption* of all

14

persons outside the pharmaceutical industry.  Nor can FTC's limited powers to "define terms" and to create "necessary and appropriate" rules justify its unprecedented Rule without ignoring the case law in this Circuit that admonishes against elevating ancillary statutory provisions into ones that alter the Act's language and fundamental structure.

The HSR Act's legislative history eliminates any possible remaining doubt.  Congress actually considered delegating to FTC the power to impose HSR Act burdens on an industry-specific basis, and chose not to do so.

I.C.    The district court deferred to FTC's interpretation not because it found the statute ambiguous but because it thought that Congress did not expressly prohibit FTC from exercising the power at issue.  This Court has rejected the district court's "that which is not forbidden is permitted" theory of deference.  Nothing supports a delegation to FTC *sub silentio* of power to target a single industry for coverage.  FTC itself has historically agreed that it lacks such authority.  Even if the Rule did not fail under *Chevron* Step One, therefore, it could not survive Step Two.

II.    The rulemaking record in this case falls woefully short of APA standards.  FTC provided no reasoned explanation for its decision to regulate certain transactions only when they arise in the pharmaceutical industry.  It neither acknowledged nor explained this departure from thirty-seven years of evenhanded

15

imposition of the HSR Act's requirements.  It refused PhRMA access to the "evidence" on which it purported to rely, and provided no substantive response to Dr. Varner's expert report.  The rulemaking "record" is a mirage that renders substantive judicial review impossible.  This Court should vacate the Final Rule.

## STANDARD OF REVIEW

Claims that regulations are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), are reviewed under the framework of *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).  Under *Chevron*, "if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent."  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012).  To make this assessment, courts "employ[] traditional tools of statutory construction," by examining "the statutory text at issue, the statute as a whole, and . . . legislative history where appropriate."  *Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*, 887 F. Supp. 2d 259, 268 (D.D.C. 2012) (citations omitted).  If this review shows that Congress intended no delegation of the authority the agency has exercised, the agency action is "unlawful" and must be "set aside."  5 U.S.C. § 706(2)(C).

The APA also requires setting aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A). Arbitrary and capricious agency action includes "entirely fail[ing] to consider an important aspect of the problem or offer[ing] an explanation for its decision that runs counter to the evidence before the agency." *Am. Petroleum Inst. v. EPA*, 684 F.3d 1342, 1350 (D.C. Cir. 2012). The record must disclose a reasoned basis for the decision, *Fox v. Clinton*, 684 F.3d 67, 74 (D.C. Cir. 2006), must particularize the reasons for the action taken, *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001), and must "'respond meaningfully' to objections raised by a party," *PPL Wallingford Energy, LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005). No deference is due to agency action based on "purported expertise." *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006). No agency decision may be upheld "on a ground other than that relied upon by the agency" in its rulemaking. *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

## <u>ARGUMENT</u>

In upholding the Final Rule, the district court determined that FTC acted within its authority under the HSR Act and satisfied the demands of the APA. The decision is wrong in both respects.

*Chevron* requires courts, in the first instance, to assess whether statutory language and legislative history permit the agency action taken, invoking traditional tools of statutory construction as they inform congressional intent. In un-

dertaking this *Chevron* Step One analysis, the agency receives no deference what-soever; if the action cannot be squared with the statutory text, that ends the matter. *Chevron*, 467 U.S. at 842-43.  Only if the statute is ambiguous regarding the propriety of the agency action does the Court move to *Chevron* Step Two, deferring to reasonable agency interpretations if grounded on stated reasons that go beyond the bald assertion of "agency expertise."

The court below misapplied *Chevron* Step One and erroneously interpreted the HSR Act to permit imposition of industry-specific coverage.  It compounded its error by moving too quickly to *Chevron* Step Two and wrongly assumed that agencies have all possible powers until Congress expressly forbids them.  And it further erred by rubberstamping a rulemaking process in which FTC failed to account for a significant reversal in its policy and substituted its self-described "expertise" for record-based decisionmaking.  PhRMA takes up each of these reversible errors in turn.

## I.      The Final Rule cannot survive *Chevron* scrutiny

### A.      The HSR Act withholds statutory authority for FTC to single out the pharmaceutical industry for special reporting burdens

The HSR Act's text, context, and history conclusively demonstrate that FTC lacks authority to target an industry for coverage.  The Rule thus cannot survive *Chevron* Step One.

1.    *The HSR Act's plain text precludes FTC's claim of authority*

Where "'the intent of Congress is clear, that [should be] the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013) (quoting *Chevron*, 467 U.S. at 842-43).  Congress has addressed the precise question in this case:  Does the HSR Act authorize FTC to issue a rule that imposes notification requirements on persons in the pharmaceutical industry who propose certain transactions but not on persons in other industries proposing identical trans-actions?  In no uncertain terms, the Act answers in the negative: "Except as *exempted* pursuant to subsection (c) of this section, *no person* shall" evade the notifi-cation requirements.  § 18a(a) (emphases added).  The "no person" mandate and the exception only for "exempt[ions] pursuant to subsection (c)" independently and unambiguously preclude FTC's statutory interpretation.

a.    *Section 18a(a)'s "no person" command forecloses FTC's singling out of the pharmaceutical industry*

FTC claims that "the granting of an exclusive right to commercially use a patent or part of a patent is a potentially reportable asset acquisition under the Act."  JA 75.  Yet its Final Rule does not command all persons proposing such transactions to first notify the agency.  Rather, FTC selectively imposes coverage on the pharmaceutical industry alone, arguing that it "is the only industry to the PNO's knowledge in which exclusive patent licenses are prevalent."  JA 77-78.

Nowhere does the HSR Act suggest, however, that its reporting requirements apply only to persons in industries where covered transactions are "prevalent," and not to persons in industries where the transactions arise sporadically or intermittently.[5] Congress instead declared that, as to all covered transactions, all persons not specially *exempted* must first notify FTC.  § 18a(a).

> b.    *Section 18a(a)'s "exempt[ion]" provision forecloses FTC's interpretation*

The district court claimed support for the Rule in FTC's authority to exempt from the HSR Act's notification requirements "classes of persons . . . or transactions" deemed unlikely to pose antitrust risks.  *See* § 18a(d)(2)(B).  Because "the agency could have achieved the same purpose reflected in the Final Rule by issuing a generally applicable rule that exempted all industries other than the pharmaceutical industry, on the basis that similar transactions in other industries do not pose an antitrust threat," the district court reasoned, it would "elevate form completely over substance" to deny FTC the power to impose the notification requirement on an industry-by-industry basis.  JA 328 (citations omitted).

Yet, far from supporting the Rule, the Act's "exemption" language *undermines* it by foreclosing FTC from excusing all industries but one from the Act's imposition of notification requirements for a newly covered suspect transac-

---

[5] PhRMA assumes the accuracy of this "prevalence" assertion here only for argument's sake. *See infra* Part II.B.

tion without any assessment of the relative antitrust threat each industry may pose. Just as clearly as the Act's "no person" language is broadly framed to ensure comprehensive coverage, FTC's exemption authority is drawn narrowly to excuse from that coverage only those "classes of persons . . . or transactions" that are actually determined to pose no real antitrust threat.

By treating the power to selectively impose as synonymous with the exemption authority Congress gave to FTC, the district court badly distorted the plain meaning of "exempt" under § 18a(c). To "exempt" is to *withhold* or *excuse* a person or transaction from a requirement applicable to all others. *See, e.g.*, Webster's Third New International Dictionary 795 (1981) (defining "exempt" as "to release or deliver from some liability or requirement to which others are subject: except or excuse from the operation of a law or obligation"). FTC did not *exempt* all persons in non-pharmaceutical industries from the notification requirements it attached to the targeted transactions; it *imposed* those requirements on persons in the pharmaceutical industry alone. And it exercised this counter-textual power of imposition without first employing the deliberative process Congress demanded before any exemption could be granted—considering whether persons outside the pharmaceutical industry but using identical transactions posed not just lesser antitrust risks, but little or no antitrust risk at all. *See* § 18a(d)(2)(B).

The district court ignored Congress's mandate that, "[e]xcept as ex-

21

empted[,] . . . no person shall" evade the notification requirement, opining that 18a(a)'s plain text was "too thin a reed" on which to disqualify the Rule.  JA 321.  But this Court has previously recognized that even a single word can derail an agency's statutory interpretation.  *See, e.g.*, *Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 4 (D.C. Cir. 2000) ("By preceding the words 'remedies and procedures' with the definite article 'the,' as opposed to the more general 'a,' or 'an,' Congress made clear that it understood [the enumerated] remedies to be exclusive.").  Here, the entire statute—not merely a single word—make plain § 18a(a)'s intent, and it unambiguously precludes the agency's construction.

### c.      *The district court ignored the HSR Act's plain language*

The statute contravenes the district court's view that the HSR Act hands FTC a "blank slate" to adjust the notification-coverage boundaries on an industry-by-industry basis.  JA 324.  Had Congress wished to give FTC such authority, it presumably would have done so expressly and with clear, specific instructions, not by backhanded implication through a strained cross-reference to a narrowly drawn exemption provision.  *See, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452-53 (2002) ("Where Congress wanted to provide for successor liability in the Coal Act, it did so explicitly, as demonstrated by other sections in the Act.").  Not even FTC has tried to stretch the statutory language so far.

Far from fashioning "blank slate" authorization, Congress meticulous-

ly spelled out the parameters of FTC's § 18a authority.  *See supra* Part I.A.1.a-b.
Broad coverage and narrow exemptions for those few whom FTC finds to present
no antitrust threat is consonant with the Act's overarching antitrust purposes.  The
district court's suggested grant of indiscriminate FTC authority to selectively im-
pose or withhold reporting requirements on suspect transactions depending solely
on which industries the agency chooses to target or ignore is wholly inconsistent
with that plain text.

2.    *The HSR Act's context confirms that Congress withheld FTC*
      *authority to impose coverage on a single industry*

Statutory context can also reveal a statute's meaning through the use
of the traditional tools of statutory construction.  Here, that context confirms what
§ 18a(a) makes plain—that "no person" may evade FTC notification requirements
for covered transactions unless specially granted a statutory exemption under
§ 18a(c).  *See Catawba County v. EPA*, 571 F. 3d 20, 35 (D.C. Cir. 2009) (citing
*Arizona Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1287 (D.C. Cir. 2000) (court must
"exhaust[] traditional tools of statutory construction" at *Chevron* Step One)).  The
court below, without even attempting to identify some ambiguity, or pretending to
pursue the HSR Act's plain meaning, resorted to traditional tools of statutory con-
struction to generate faux confusion.  That effort was improper and, in any event,
unavailing.  *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1126
(D.C. Cir. 2013) (explaining that courts "exhaust[] the traditional tools of statutory

23

construction to determine whether a congressional act admits of plain meaning").

> a.    *The broader statutory scheme and the structure of the HSR Act demonstrate that Congress did not authorize FTC to impose the notification requirements on an industry-specific basis*

It is "'a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Loving v. IRS*, 742 F.3d 1013, 1020 (D.C. Cir. 2014) (quoting *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012)). Juxtaposed against industry-specific antitrust statutes, the universality of the HSR Act's coverage comes into sharper relief. "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

That is the case here. The HSR Act is a component of a far larger, and quite complex, antitrust statutory scheme, which includes many industry-specific statutes.[6] The HSR Act expressly recognizes as much, exempting from its coverage transactions that occur in industries already subject to industry-specific antitrust regulations. *See* § 18a(c)(6). FTC has explained that, because of this exemp-

---

[6] *See, e.g.*, the Cable Communications Policy Act of 1984, 47 U.S.C. § 521(4) (promoting competition in cable communications); 49 U.S.C. §§ 10706(a)(2)(A), 11321(a), 11324 (same for "water carriers"); the Natural Gas Act, 15 U.S.C. § 717t-2(a)(1) (same for natural gas); 49 U.S.C. § 41308 (same for international airline alliances).

tion, the HSR Act "does not require notification for . . . [a]cquisitions in *regulated industries*, whose competitive effects are reviewed by other agencies . . . ." Federal Trade Commission, FTC Premerger Notification Introductory Guides, ¶ 42,502 Introductory Guide II (2014), 2010 WL 293202 (emphasis added). Congress was thus aware of extant industry-specific antitrust laws when it drafted the HSR Act and intentionally imposed a *general* notification requirement.[7] This context makes all the clearer the HSR Act's textual commitment to universal application except as Congress has itself provided an industry-specific exemption.

The Rule also ignores the Act's own structure. Section 18a imposes the notification requirement broadly on all persons subject only to twelve express, limited exemptions. Ultimately, whether viewed as a narrow imposition on a single targeted industry or a broad all-but-one-industry exemption, the Rule undermines the Act's unmistakable broad-imposition narrow-exemption structure and is therefore invalid as a matter of law.

> b.  *FTC cannot use its authority to define terms or adopt "necessary and appropriate" rules to distort the HSR Act's structure*

FTC attempted to justify its targeted regulation under its authority to

---

[7] *See, e.g.*, 43 Fed. Reg. 33,450, at 33,488 (July 31, 1978) (explaining that § 18a(c)(6) exempts "transactions which require agency approval under" several industry-specific antitrust laws).

define terms. JA 75.[8] But FTC cannot use its term-defining authority to thwart the very statute the definitions are intended to serve. Courts avoid interpretations that elevate "ancillary provisions" into ones that "alter the fundamental details of the regulatory scheme." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *accord Gonzales v. Oregon*, 546 U.S. 243, 267 (2006). When Congress planted the "no person" mandate at the core of the statute's broad-imposition narrow-exemption structure, it precisely defined how the HSR Act's coverage was to be understood and applied. FTC's attempt to use its term-defining authority to emasculate the "[e]xcept as exempted . . . no person" command "alter[s] the fundamental details of the regulatory scheme." *Id.* Unless the agency's term-defining power is limited to defining terms consistently with other statutory provisions, that seemingly innocuous power becomes a weapon that the agency can wield to render a nullity any statutory provision that it finds inconvenient.

This Court has rejected similar agency abuse of term-defining powers. In *NRDC v. EPA*, the Court considered an EPA rule that defined "commercial or industrial waste" to include solid waste combusted at incinerators that did not provide for energy recovery. 489 F.3d 1250, 1258 (D.C. Cir. 2007). Defining "commercial and industrial waste" in this way effectively created exceptions to the defi-

---

[8] The Final Rule defines the terms "all commercially significant rights," "limited manufacturing rights," and "co-right," none of which appears in the HSR Act or any of the agency's prior regulations. JA 74.

nition of "solid waste incineration unit" beyond those in the statute. *Id.* This Court vacated EPA's rule at *Chevron* Step One, rejecting EPA's argument that it was merely resolving an ambiguity. *Id.* The Court explained that Congress's use of the word "any" in the definitional phrase "*any* facility which combusts any solid waste from commercial or industrial establishments" made the text clear and unambiguous; EPA accordingly had no authority "to create exceptions not explicitly listed in the statute through its definition of 'commercial or industrial waste.'" *See id.* at 1259-60 (emphasis in original).

The same analysis applies here. The HSR Act lists specific exemptions and, "[e]xcept as exempted," mandates that "no person" shall evade the otherwise blanket notification requirements. The district court's suggestion notwithstanding, FTC nowhere invoked its exemption authority in fashioning the Final Rule. Just as "the word 'any' is usually understood to be all inclusive," *id.* at 1257, "no person" can only be understood as all-exclusive. *See, e.g.*, *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 553 (D.C. Cir. 2009) (explaining that the words "[n]o person shall" broadcast signals by radio without a license "positively requires a purported broadcaster to secure a license from the FCC to transmit broadcast signals by radio"); *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 925 (D.C. Cir. 2013) (explaining that the words "no person . . . may" created a "general prohibition" subject only to the "two exceptions" expressly listed in the statute). Just as

27

EPA presented no compelling reason "why 'any' should not mean 'any'" in *NRDC*, FTC presents no compelling reason—or any reason at all—why "no person" should not mean "no person." 489 F.3d at 1260. As in *NRDC*, this Court should not allow FTC to use its term-defining power to rewrite the statue's plain language. *Id.* at 1259-60.

FTC also claimed, JA 74, that it could single out the pharmaceutical industry using its authority to "prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section." § 18a(d)(2)(C). The "necessary and appropriate" language is, however, hardly the font of limitless power that FTC suggests. By its terms, it pertains only to the contents of the notification submission itself, granting the agency authority to ensure that, when the HSR Act requires premerger notification of a particular transaction, the notice given to the antitrust agencies is "in such form and contain[s] such documentary material and information" as is "necessary and appropriate" for the Commission to discern whether the proposed transaction, if consummated, likely violates the antitrust laws. § 18a(d)(1). This modest language cannot sustain selective imposition of reporting burdens on one industry, but no others, for indistinguishable transactions.

This Court recently addressed an agency's misuse of a similar authority in *NRDC v. EPA*, 749 F.3d 1055, 1063-64 (D.C. Cir. 2014). There, EPA argued that an even more broadly worded Clean Air Act provision, authorizing EPA's

Administrator to "prescribe such regulations as are necessary to carry out his functions under" the Act, allowed her to adopt an affirmative defense to private civil suits under the Act even though the statute contemplated no such affirmative defense. *Id.* Rejecting that argument, this Court explained that "EPA's authority to issue ancillary regulations is not open-ended, particularly when there is statutory language on point." *Id.* at 1063 (citing *American Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) ("the general grant of rulemaking power to EPA cannot trump specific portions of the CAA")). Even more so here, FTC "cannot rely on its gap-filling authority to supplement the [HSR] Act's provisions when Congress has not left the agency a gap to fill." *Id.* at 1064. The power to prescribe what is "necessary and appropriate" for meaningful notification cannot authorize imposing such notification on only some while turning a blind eye to all others.

   3.    *The HSR Act's legislative history contradicts FTC's interpretation*

         Legislative history is unnecessary when text and structure are so clear. But the HSR Act's history is striking in its direct confrontation—and rejection—of the very authority that FTC now claims. The original Senate draft, known as the Hart-Scott Bill, S. 1284, 94th Cong. (1975), began with a "Declaration of Policy," including the need for antitrust regulation geared toward specific industries: "investigations by the Federal Trade Commission . . . have identified conditions of excessive concentration and anticompetitive behavior in various industries." S. 1284,

94th Cong. § 102(a)(5) (1975).  Unlike the eventual HSR Act, S. 1284 allowed FTC to impose the Act's reporting requirements on any "person or persons engaged in commerce, or in any activities affecting commerce, and not subject to subsection (a) of this section," and further authorized FTC, after consulting the DOJ, "to require pre-merger notifications from particular companies or industries or from any class or category of persons."  S. 1284, 94th Cong. § (b)(3) (1975); 122 Cong. Rec. 29,342 (1976).  It did *not* cabin FTC's exemption power to classes of persons and transactions that FTC found unlikely to violate the antitrust laws. By giving FTC *carte blanche* power to impose or withhold notification requirements, regardless of the relative likelihood of antitrust violations, the original bill would have left expansion and contraction of the Act's coverage *entirely* to FTC. Senator Hart readily acknowledged that the Senate bill sought "to give the antitrust agencies full authority to require pre-merger notification from particular companies or industries."  122 Cong. Rec. S15,417 (Sept. 8, 1976).

The House saw things quite differently and passed a version of the bill that more closely resembles the current HSR Act.  H.R. 14,580, 94th Cong. (1976). It dropped the Senate bill's industry-specific focus; adopted the "no person" notification requirement, imposing it on all transactions of a certain size "[e]xcept as exempted pursuant to subsection (c)"; exempted twelve "classes of transactions," including those FTC exempted "under subsection (d)(2)(B)"; and delegated no pow-

er to FTC to impose coverage indiscriminately on persons engaged in commerce. H.R. 14,580, 94th Cong. § 7A(a)-(c) (1976). This was deliberate. Representative Hughes, for instance, explained that "[t]he grant of discretion [in S. 1284] to enforcement agencies to *enlarge* the coverage of a law is most unusual." *Id.* (emphasis added). The House overwhelmingly passed H.R. 14,580. 122 Cong. Rec. H8,169.

When Congress ultimately passed a compromise bill, it was clear that the House version had won the day. 122 Cong. Rec. S15,420 (Sept. 8, 1976). Chairman Rodino observed that "the House prevailed in 90 percent of the areas that might have shown some differences." 122 Cong. Rec. H10,290 (Sept. 16, 1976). He explained that "[i]n the view of the House conferees," the Senate bill's provision allowing FTC to indiscriminately impose the Act's requirements, or not, on persons engaged in commerce was troubling because "the coverage of this bill should be decided by Congress—not FTC and the Justice Department." 122 Cong. Rec. H10,294 (Sept. 16, 1976). "In particular, the Senate provision was rejected because it . . . set no qualifications, standards, or conditions upon the rulemaking authority." *Id.* This history demonstrates that Congress specifically contemplated—and declined—giving FTC the authority that it now illicitly claims as its own.

The district court reasoned that the legislative history does not actually demonstrate that Congress rejected Senator Hart's plan to pass a law that "re-

31

quire[d] pre-merger notifications from particular companies or industries." JA 330 (quoting 122 Cong. Rec. S15,417 (Sept. 8, 1976)). According to the district court, the fact that Senator Hart went on to explain that "[d]eletion of th[e] provision [that would have allowed industry-specific regulation] is not intended to affect the authority of the Federal Trade Commission to require such notification under existing provisions" demonstrates that "FTC's authority to impose rules, create definitions, and exempt industries from the requirements of the section was left intact for all transactions that *meet* the minimum size requirements." JA 330-31.

But the district court only quoted *half* of Senator Hart's statement. Read in context, the "existing provisions" he had in mind were *not* HSR Act provisions: "Deletion of this provision is not intended to affect the authority of the Federal Trade Commission to require such notification under existing provisions of the Federal Trade Commission Act either as presently required by the FTC or as may be modified to parallel the procedures of Title II of this Act." 122 Cong. Rec. S15,417 (Sept. 8, 1976). Senator Hart thus referenced provisions of a *different statute*—the Federal Trade Commission Act. *See* § 41 *et seq.* With respect to the HSR Act, though, the Senate had lost the battle. FTC would not be allowed to single out industries for regulation under it; that was left to Congress. Yet FTC has undertaken to exercise the very power Congress prohibited.

FTC argued below that Congress rejected the Senate bill because "the

32

unenacted Senate bill provision on which Plaintiff relies addressed a separate issue: it would have given the Commission expanded authority with respect to transactions *below the monetary thresholds prescribed by Congress.*"  JA 282 (citing S. 1284, 94th Cong., 2d Sess. 68 (May 6, 1976) (emphasis in original)).  But it was the *Senate* leadership—the authors of S. 1284—who understood the debate to center on industry-specific regulation, as Senator Hart unambiguously stated.  122 Cong. Rec. S15,417 (Sept. 8, 1976) ("particular companies or industries").  The House leadership found this unacceptable and successfully removed it.

The Commission's argument that the House, and ultimately the Conferees, only cabined FTC authority to impose the notification requirement selectively on below-threshold transactions overlooks the obvious.  The legislators had no need to scrutinize above-threshold transactions because the House-added command that "no person shall" evade notification removed all need for discussion of *selective* treatment at that level.  Rather, the House Conferees were intent on corralling FTC's below-threshold authority in like manner to completely foreclose any targeted agency impositions of notification requirements.  Chairman Rodino made the Conferees' purpose perfectly clear: "[T]he coverage of this bill should be decided by Congress—not the FTC and the Justice Department."  122 Cong. Rec. at H10,294 (Sept. 16, 1976).  "The fact that Congress specifically rejected language favorable to [one party's] position and enacted instead language that is consistent

33

with [the other party's] interpretation only strengthens our conclusion that [the lat-ter party] has correctly ascertained Congress' intent." *Arizona Pub. Serv. Co.,* 211 F.3d at 1289.

*          *          *

Accordingly, consideration of "the text, structure, purpose, and history of" the HSR Act leaves no doubt under a *Chevron* Step One analysis that Congress clearly established its "intent about the precise question at issue." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696 (D.C. Cir. 2014) (quoting *Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 503 (D.C. Cir. 2013) (internal quotation marks omitted)). Section 18a(a) mandates that "except as exempted, . . . no person shall" evade imposed notification requirements. By no stretch of statutory interpretation does this language delegate to FTC the power to impose those notification burdens on a single industry, but not others, for identical covered transactions. Under *Chevron* Step One, that ends the inquiry, and the Rule must be invalidated.

### B.    The Rule merits no deference because it is unreasonable and contradicts the agency's own longstanding construction of the HSR Act

This Court has explained that it will only "defer to an agency's interpretation of a law it administers . . . to the extent the Congress has delegated interpretive authority to the agency." *Friedman v. Sebelius*, 686 F.3d 813, 819 (D.C.

34

Cir. 2012) (citing *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990)). Even if the HSR Act's text, context, and history did not compel the conclusion that the Rule depends on authority that Congress withheld, the Commission's new statutory construction would nonetheless be entitled to no deference under *Chevron* Step Two.

1. *The district court misapplied the* Chevron *Step Two analysis*

In the district court's view, FTC's statutory interpretation deserved *Chevron* deference merely because "[n]o statutory text directly forecloses the FTC's authority to apply an industry-specific rule." JA 338. The district court's theory of administrative law could be summed up as "that which is not forbidden is permitted." But this Court has long rejected that approach as incompatible with the very nature of agencies. *See, e.g.*, *In re Sealed Case*, 237 F.3d 657, 667 (D.C. Cir. 2001) (holding that, because the FECA nowhere authorized the FEC to "make public an ongoing investigation," the statute's "clear meaning" denied it that power). Instead, the judiciary can only defer to an agency's statutory interpretation when Congress has delegated to the agency the power it claims. In *American Bar Association v. FTC*, for example, FTC claimed that its authority to regulate "entities engaged in 'financial activities'" included the right to regulate attorneys engaged in the practice of law. 430 F.3d 457, 468 (D.C. Cir. 2005). Just as here, FTC "repeatedly repair[ed] to the position that no language in the statute exempts

attorneys from regulation." *Id.* This argument did not persuade the Court; it triggered a refresher on basic *Chevron* principles. "As we have often cautioned," it began,

> "[t]o suggest, as the [Commission] effectively does, that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power . . . is both flatly unfaithful to the principles of administrative law . . . and refuted by precedent." Plainly, if we were "to presume a delegation of power" from the absence of "an express *withholding* of such power, agencies would enjoy virtually limitless hegemony . . . ." Therefore, if there is the sort of ambiguity that supports an implicit congressional delegation of authority to the agency to make a deference-worthy interpretation of the statute, we must look elsewhere than the failure to negate regulation of attorneys. That failure does not advance the Commission's cause at all.

*Id.* at 468-69 (quoting *Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (*en banc*) (emphasis in original)). The Court concluded that "the question is not whether the statute permits exemption from regulation for attorneys, but whether it supports such regulation at all. We will defer to the agency's interpretation on that subject only if the statute 'is silent or ambiguous with respect to the specific issue.'" *Id.* at 469 (quoting *Barnhart v. Walton*, 535 U.S. 212, 218 (2002) (internal quotation marks and citation omitted)).

This Court rejected EPA's invocation of this flawed approach to agency power in *NRDC*. *See supra* at 28-29 (discussing *NRDC*, where EPA sought to adopt an extra-statutory affirmative defense). EPA contended that, because the Clean Air Act "does not expressly deny EPA the ability to create an affirmative de-

36

fense," the Court should defer to its assertion of that power.  749 F.3d at 1064.

This Court rejected "the suggestion implicit in EPA's argument—that we should

'*presume* a delegation of power absent an express *withholding* of such power'"—

because it is "'plainly out of keeping with *Chevron*.'"  *Id.* (quoting *Ry. Labor Ex-

ecs. Ass'n*, 29 F.3d at 671).[9]

> ### 2.     *FTC's assertion of power it has long disclaimed further high-lights the unreasonableness of its interpretation*

Since the HSR Act's passage, FTC has routinely disclaimed the very

authority that it now invokes.  That consistent approach since 1976 further illus-

trates why its new interpretation is entitled to no credence.  *See, e.g.*, *Fin. Planning

Ass'n v. SEC*, 482 F.3d 481, 490 (D.C. Cir. 2007) ("an additional weakness" in the

SEC's interpretation of the statute was that it "flouts six decades of consistent SEC

understanding of its authority under" the statute).  In thirty-seven years of adminis-

tering the HSR Act, FTC not only never claimed authority to impose the notifica-

tion requirements in an industry-targeted manner, but rejected that "heretofore un-

discovered carte blanche grant of authority" from § 18a.  *Loving*, 742 F.3d at 1020.

Like Congress, FTC "has directly spoken to the precise question at issue."  Its very

first rules implementing the HSR Act proclaimed that "[t]he Commission does not

believe that . . . a particular type of [transaction] is less likely to be anticompetitive

---

[9] PhRMA's *Chevron* Step One arguments all support its Step Two contention that
FTC's statutory interpretation is unreasonable even if this Court affords it *Chevron*
deference.  *ABA*, 430 F.3d at 471.

simply because it is commonly used in a particular industry." 43 Fed. Reg. at 33,496. Instead, FTC faithfully enforced the Act's broad-imposition narrow-exemption structure: "[A]n acquisition . . . is subject to the requirements of the act *whenever* the criteria of the act are satisfied and no exemption applies." *Id.* at 33,485 (emphasis added).

FTC was equally uncomfortable with exercising its exemption authority on an industry-specific basis. It "ha[d] difficulty with the suggestions made in a significant number of comments received in response to the originally proposed rules, that narrow exemptions relating to specific types of joint ventures in particular industries would be appropriate." 43 Fed. Reg. at 33,496. It "invite[d] specific suggestions concerning principles of general application to broad classes of joint ventures, regardless of the specific industry or particular purpose of the joint venture, which may serve to distinguish those ventures raising little likelihood of anti-trust problems," emphasizing that it was "not inclined to grant exemptions absent clear indication that they are warranted under the Act." *Id.* Much to FTC's chagrin, "[d]espite this instruction, numerous comments persisted in urging industry-specific exemptions." *Id.* Directly relevant here, the Commission flatly rejected those comments, explaining that, in its view, a transaction is not "less likely to be anticompetitive simply because it is commonly used in a particular industry." *Id.*

In *Loving*, this Court "f[ou]nd it rather telling that the IRS had never

38

before maintained that it possessed this authority."  742 F.3d at 1021.  Here, FTC

not only never claimed the authority to target a single industry for discriminatory

regulation, it has consistently resisted entreaties to do so and has publicly empha-

sized the importance of evenhanded regulation.  *See also* APEC-OECD Integrated

Checklist     on     Regulatory     Reform     at     6,     available     at

www.oecd.org/regreform/34989455.pdf ("[L]aws and policies should refrain from

applying different requirements or procedures to different . . . goods [or] ser-

vices."); Anne K. Bingaman, The Role of Antitrust Intellectual Property (June 16,

1994), available at http:www.justice.gov/atr/public/speeches/0112.htm (emphasiz-

ing that antitrust enforcement must be "fair" and "evenhanded").  FTC's argument

that now it should be allowed to burden the pharmaceutical industry, but no one

else, with new notification obligations stretches its claim for deference beyond the

breaking point and should be rejected.

## II.     The Rule is invalid because it is arbitrary and capricious

### A.     The Rule springs not from reasoned decisionmaking based on record evidence but from shallow invocation of FTC "experience"

FTC has received tens of thousands of notifications over the years,

and it can even investigate non-reported transactions falling below the filing

thresholds.  Yet it has identified zero transactions of the type the Rule targets that it

has ever unwound, challenged, or even investigated for being potentially anticom-

petitive—much less one ever declared violative of the antitrust laws.  The over-

whelming evidence before the agency therefore demonstrates that these transactions are not problematic. Moreover, the targeted transactions are not unique to the pharmaceutical industry. FTC has acknowledged that too,[10] yet offered no explanation for suddenly perceiving antitrust threats only when the pharmaceutical industry uses these transactions. It provided only the most casual reference to its "experience," an *ipse dixit* that precludes meaningful review. JA 78 ("[I]n the PNO's experience, the pharmaceutical industry is the only industry in which parties regularly enter into exclusive patent licenses that transfer all commercially significant rights.").

The district court nonetheless adopted that rationale, opining that "FTC has . . . supported its [targeted regulation of the pharmaceutical industry] with a sensible reason—the agency's lack of experience with patent rights outside the pharmaceutical industry." JA 343. The district court thus concluded that "FTC may rely on its own experience without providing documentation or statistics showing the nature, extent, or other particulars of their experience or how, under what circumstances, and under the tutelage of which individuals that alleged experience may have been derived." JA 349 (internal quotations marks omitted).

---

[10] *See, e.g.*, JA 70 ("the PNO has found that exclusive patent licensing agreements that transfer all of the rights to commercially use a patent or part of a patent *almost* solely occur in the pharmaceutical industry") (emphasis added); *id.* ("PNO *typically* does not see exclusive transfers of rights to a patent or part of a patent outside the pharmaceutical context.") (emphasis added).

But invoking "experience," without more, is the very opposite of a reasoned explanation, as any *ipse dixit* is.  An agency must "provide a reasoned analysis, resting on an articulated objective, that would justify treating [one entity] differently than [all others]."  *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 21 (D.C. Cir. 2014).  By contrast, "[a]gency action is arbitrary and capricious if 'the agency offers insufficient reasons for treating similar situations differently.'"  *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) (citations omitted).  FTC's naked resort to "experience" cannot paper over its failure to offer a reasoned, record-based rationale for why singling out the pharmaceutical industry faithfully enforces the statute.  Accordingly, even if the Rule somehow survived *Chevron*, it would nonetheless fail under traditional review of administrative action.

1.  *FTC offered no reasoned basis for departing from its own longstanding views*

The Rule marks the first time FTC has singled out an industry for regulation.  It also represents the first time FTC has required notification for exclusive patent licenses, presumably because it now believes that they raise antitrust concerns (a finding that is at odds with its four-decade history and, at best, implicit and nowhere contained—much less explained—in the record).  "It is textbook administrative law that an agency must provide a reasoned explanation for departing from precedent or treating similar situations differently."  *W. Deptford Energy, LLC*, 766

41

F.3d at 20 (internal quotation marks omitted). At a minimum, to sustain its new assertion of the power to implement the HSR Act in a discriminatory manner, FTC "was obligated to provide a reasoned explanation of how applying [the Act in a discriminatory way] comported with the text of the Act and prior Commission precedent." *Id.* at 18. FTC provided no such reasoned explanation.

FTC's interpretations of the HSR Act in prior rulemakings demonstrate that, until now, there has been an unbroken agency practice of recognizing its statutory obligation to proceed in a uniform, evenhanded manner. *See supra* Part I.B.2 (quoting various FTC assertions about the Act at odds with its new claim of authority). This Rule marks an about face; and far from explaining why, FTC refused even to acknowledge the shift in its policy.[11]

The Commission also abandoned its stated policy of tying changes in the HSR Act's coverage to antitrust considerations, *see supra* Part I.B.2. It denied any obligation to conclude—much less provide a reasonable, reviewable explanation for its conclusion—that the covered transactions are likely to be anticompetitive.[12] Although that directly contradicts FTC's past stated view of the Act's pur-

---

[11] *See* JA 78 ("[T]he Commission is not expanding the HSR requirements to parties or transactions not covered by the Act."); JA 76 ("In effect, however, with the exception of the treatment of the right to manufacture exclusively for the licensee, the rule treats the reportability of exclusive licensing arrangements . . . in the same way the PNO has for decades.").

[12] *See* JA 197 ("[The HSR Act's] reporting requirement is based on size alone,

pose, *see supra* Part I.B.2, FTC neither acknowledged nor explained its policy shift.

FTC attempted to excuse its failure to provide a reasoned explanation by insisting that it, "[l]ike [a] legislature, [is] not required to resolve a problem that may occur more broadly in one fell regulatory swoop." JA 79 (internal quotation marks omitted). Of course, *elected* legislatures need not comport with the APA's requirements of faithfulness to statutory text and reasoned, record-based deci-sionmaking; that is the duty of agencies carrying out the will of elected lawmakers. This Court has rejected similar agency attempts to frame indifference to APA re-quirements as cautious observance of them. Agencies may regulate in stages where that is consistent with the statute, but that does not excuse the obligation to provide a reasoned explanation for how such a piecemeal approach comports with the governing statute and record evidence. *W. Deptford Energy*, 766 F.3d at 20 (rejecting a piecemeal approach because "the Commission must first provide a rea-soned decision explicating how such [a] case-by-case [approach] . . . jibes with the [statute]"). Here, FTC failed its obligation miserably, providing nothing to inform PhRMA, the court below, or this Court how it concluded that the targeted transac-tions pose antitrust concerns only when they arise in the pharmaceutical industry.

---

without regard to whether particular transactions are likely to cause anticompeti-tive harm or would prove particularly difficult to unwind."); *see also* JA 78 n.24.

2.    *FTC's appeals to its own expertise cannot justify the Final Rule*

As a poor substitute for reasoned explanation, FTC rested its justification for its Final Rule on its sterile incantation of agency "expertise" and "experience." But expertise is a predicate, not a substitute, for the reasoned explanation required by law. As this Court has explained: "While it is true that we owe particular deference to [the agency] when its rulemakings rest upon matters within the agency's sphere of special competence and statutory jurisdiction . . . [the agency] must still articulate a rational connection between the facts found and the choice made." *Nat'l Ass'n of Clean Water Agencies*, 734 F.3d at 1145 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

FTC provided no such explanation. Agencies' legitimacy, and their right to wield vast power over citizens, depends on their creation of a *record* that *explains* why they have taken various actions and that will permit judicial review of those actions. Courts "cannot defer, indeed [they] cannot even engage in meaningful review, unless [they] are told which factual distinctions separate arguably similarly situated [parties], and why those distinctions are important." *Pub. Media Ctr. v. FCC*, 587 F.2d 1322, 1331-32 (D.C. Cir. 1978) (internal quotation marks omitted). In other words, "the failure of an administrative agency to articulate the reasons for a particular decision makes meaningful review of that decision impossible." *Id.* FTC nowhere articulates why different industries should be treated dif-

ferently with respect to the same exclusive patent arrangements, or indeed why those newly targeted arrangements even require burdening any persons, let alone industries, with expanded reporting obligations.[13]  It relies, instead, only on a self-described assertion of "experience" and "expertise," without further explanation or helpful embellishment as to the source, background, or nature of that agency insight.  Such a cavalier approach undermines the core values undergirding reasoned decisionmaking, and, therefore, the structure of administrative law itself.

Moreover, the unexplained statement that "the Commission has not yet determined that a specific rule is necessary with respect to other industries," JA 78, has nothing to do with the Act's antitrust purposes.  It instead reveals FTC's particularly rigorous scrutiny of the pharmaceutical industry relative to others.  While PhRMA does not seek to diminish appropriate regulatory oversight over its industry, it is at least entitled to a *rationale* when that scrutiny manifests as a discriminatory regulatory burden.  One need not speculate about motives to recognize that the potential for targeting one disfavored group is a key basis for requiring

---

[13] Beyond posing no discernible antitrust threat, these transactions do not entail irreversible integration between the parties or an irretrievable mingling of assets. The licensor continues to function as an independent entity, often owning and operating the manufacturing capacity and expertise for the patented product and maintaining ownership of the intellectual property.  "The independent identity of the acquired firm [licensor]" does not "disappear[]," H.R. Rep., No. 94-1373 at 8, and thus these transactions do not implicate a key concern prompting enactment of the HSR Act: "reducing the problem of unscrambling the assets after [an anticompetitive] transaction has taken place."  52 Fed. Reg. 20059 (1987).

record-based explanation in the first place.  *See* Friendly, *Indiscretion About Dis-cretion*, 31 Emory L.J. 747, 757 (1982) ("[R]eview tends to eliminate or curtail de-cisions based on impermissible factors.").

The district court was satisfied that FTC supported its decision to im-pose onerous regulatory burdens on the pharmaceutical industry alone "with a sen-sible reason—the agency's lack of experience with patent rights transfers outside the pharmaceutical industry."  JA 343.  But FTC's admitted knowledge disparity is the predictable consequence of its zealous study of the pharmaceutical industry, not of an evenhanded investigation of the relative antitrust threats posed by differ-ent classes of persons.  *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014) (explaining that agency action is arbitrary and capricious where the agency does not "examine the relevant data and articulate a satisfactory expla-nation for its action") (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

At bottom, the agency claims it is reasonable to single out the phar-maceutical industry for extra regulatory burdens today because it has previously singled out that industry for extra investigation in other contexts.  But heightened scrutiny in the past, for whatever reasons, hardly justifies unexplained disparate treatment under the new Rule with respect to a newly covered patent transaction. *See Muwekma Ohlone Tribe*, 708 F.3d at 216 ("Agency action is arbitrary and ca-

pricious if 'the agency offers insufficient reasons for treating similar situations differently.'") (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999)).

Relatedly, the Rule is arbitrary and capricious because it is based on considerations "which Congress has not intended [FTC] to consider." *State Farm*, 463 U.S. at 43. Instead of focusing on whether exclusive license transactions were likely to be more anticompetitive when they arise in the pharmaceutical industry, FTC focused on their presumed "prevalence" and "frequency" in that industry.[14] But the HSR Act never mentions transactions' "prevalence" or "frequency" as a reason for subjecting them to the notification requirements, and FTC has said just the opposite in past rules: "The Commission does not believe that [a particular transaction] is less likely to be anticompetitive simply because it is commonly used in a particular industry." 43 Fed. Reg. at 33,496. That would appear to be particularly apposite here where anticompetitive behavior does not appear to have *ever* been associated with the covered transactions, regardless of "prevalence."

### B.   FTC failed to examine (or even provide) relevant data to make a rational connection from record-based facts to the Rule

"[M]aterial critical to an agency's decision must be revealed." *Pers.*

---

[14] *See, e.g.*, JA 77-78 ("The rule is limited to the pharmaceutical industry not because of the uniqueness of the incentives in that industry but because it is the only industry to the PNO's knowledge in which the exclusive patent licenses are prevalent.").

*Watercraft Indus. v. Dep't of Commerce*, 48 F.3d 540, 544 (D.C. Cir. 1995). Otherwise, the APA's "presumption of judicial review" is rendered meaningless. *Id.* FTC refused, with the district court's blessing, to produce the factual foundation for its claimed experience with pharmaceutical exclusive-licensing transactions.

      1.   *The exclusive-patent-license filings and informal database do not supply a reasoned explanation for the Rule*

      The only data that apparently informed FTC's decision to target the pharmaceutical industry are the sixty-six "filings . . . involving exclusive patent licenses" that the Final Rule puts forward as proof of the "need" for a targeted Final Rule. JA 77. Those data therefore go to the heart of PhRMA's APA challenge. But PhRMA never received them, and FTC failed to identify them, let alone explain what they involved or how they support the Final Rule. For example, it did not say how many—if any—were the "exclusive patent licensing arrangements that transfer all of the rights to commercially use a patent or part of a patent" that the Final Rule targets. *Id.* By withholding that source information, FTC impeded PhRMA's ability to challenge the agency's basis for the Final Rule and the courts' ability to meaningfully review it. *Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) ("By requiring the most critical factual material used by the agency be subjected to informed comment, the APA provides a procedural device to ensure that agency regulations are tested through exposure to public comment, to afford affected parties an opportunity to present comment and evidence to sup-

port their positions, and thereby to enhance the quality of judicial review.").

Nor does FTC's conclusory reliance on unidentified portions of its in-complete database of "informal requests," JA 76, help its cause. The PNO "an-swers thousands of letters and emails regarding the HSR Rules, giving informal advice on the potential reportability of transactions . . . ." *See* About Informal In-terpretations, available at http://www.ftc.gov/enforcement/premerger-notification-program/informal-interpretations/about-informal-interpretations. The PNO keeps its informal interpretations in a database on its website as "a reference tool for oth-ers with similar questions." *Id.* FTC did not say how many requests the PNO had received, when they were made, or by whom. It was simply pointing to a haystack and telling PhRMA, and the courts, that needles were in there somewhere. Given that there is no evidence that the antitrust agencies have ever investigated, much less unwound, such a transaction, it is unlikely that the PNO did anything other than inform each of the unknown requestors that their transactions were unreporta-ble. Asserting that some extra-record evidence *may* exist does not explain *how* that evidence supports an agency's decision. FTC has never stated which of the 3,852[15] opinions that were in the database as of November 6, 2013, when it promulgated

---

[15] As of the date this brief was filed, the database contained 3,944 opinions. Sort-ing them by date shows that 92 of those 3,944 were dated *after* the Final Rule was promulgated on November 6, 2013, leaving 3,852 that the agency at least could have considered when fashioning the Final Rule.

the Final Rule, it considered when fashioning the Rule, how much weight it assigned them, or the extent to which it considered opinions that did not support the Final Rule. "'It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency.'" *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) (quoting *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973)).

What is more, the district court assumed that the database was complete, reliable, and easily accessible. *See* JA 352 ("The informal interpretations the PNO produces in response to requests for interpretations are publicly available and searchable on the FTC's website."). That assumption is demonstrably incorrect.

No review of the informal database could discern what FTC found relevant to this rulemaking. First, relatively little informal guidance is even available. The database contains only 3,944 informal interpretations from 1983 to the present. For example, only eighty-three come from 2013—a minuscule fraction of the "thousands" of responses FTC doled out that year. *See* Hart-Scott-Rodino Annual Report Fiscal Year 2013, available at http://www.ftc.gov/system/files/documents/reports/36th-report-fy2013/140521hsrreport.pdf ("In fiscal year 2013, the [PNO] continued to respond to thousands of telephone calls seeking information about the reportability of transactions under the HSR Act."). FTC itself has

disavowed the reliability of its database as any guide to its experience and, instead, issued a disclaimer that warns that "[w]hile [the] letters and emails are made available for public inspection and copying pursuant to 5 U.S.C. § 552(a)(2), FTC does not warrant or represent that (a) the letter and email database contains all letters and emails." *See* About Informal Interpretations, available at http://www.ftc.gov/es/node/126268.  According to the Premerger Notification Practice Manual (assembled by a working group of private practitioners and PNO Staff), "only a fraction of the interpretations made by the PNO each year are documented in letters sent to the PNO."  ABA Section of Antitrust Law, Premerger Notification Practice Manual (4th ed. 2007), at xvi.

The minuscule percentage of opinions that *are* available in the database are heavily redacted.  Importantly, the vast majority *do not identify the industry* of the party seeking the guidance.  The website disclaimer also warns that FTC "does not warrant or represent that . . . the letters and emails in the database are accurate and complete . . . or [that] the letters and emails represent the current views of the PNO staff."  About Informal Interpretations, available at http://www.ftc.gov/es/node/126268.  It even disclaims "all responsibility and liability arising from [practitioners'] use of or reliance on the letter and email database as a reference source" and "makes no representations or warranties of any kind, express or implied, that using the letter database or the site will assist [practi-

51

tioners] in any way, whether in the practice of law or for any other purpose." *Id.* Experienced HSR Act practitioners have aptly dubbed FTC's informal guidance "a large body of unwritten lore." Gregory L. Kinzelman, *United States v. Malone*: Lessons for HSR Practitioners on Premerger Notification Office Informal Interpretations, Antitrust Source at 5 (Feb. 2010). With the redactions and the open *denial* of the database's reliability even for general purposes, this informal guidance can hardly sustain an unprecedented new Rule. *See Am. Radio Relay League, Inc.*, 524 F.3d at 237-38 (holding that an agency's redactions prevented meaningful notice and an opportunity for comment); *see also SecurityPoint Holdings, Inc. v. Transp. Security Admin.*, No. 13-1068, Slip Op. at 7 (D.C. Cir. Oct. 28, 2014) (invoking "*de minimis non curat lex*" to disregard evidence brought forward by agency because even if it was relevant, it was not significant enough to justify the agency's decision).

FTC's heavy reliance on its own sense of these transactions' relative "prevalence" in the pharmaceutical industry compared to elsewhere over the last five years is unavailing. For there is no way to assess that claim without access to the data, filings, and requests FTC has received over that time period. Thus, even if "prevalence" could be a legitimate explanation, standing alone it would not be a *reviewable* one subject to meaningful notice and comment. And even if FTC's online database *were* complete, reviewable, and searchable, the agency's failure to

explain its contents would render it useless for justifying discriminatory regulation. *Am. Radio Relay League, Inc.*, 524 F.3d at 239 ("[T]he Commission can point to no authority allowing it to rely on the studies in a rulemaking but hide from the public parts of the studies that may contain contrary evidence, inconvenient qualifications, or relevant explanations of the methodology employed.").

> ## 2. *FTC wrongly assumes that the pharmaceutical industry deserves targeted regulation because it has sought informal guidance from the agency*

To the extent that any of FTC's "evidence" actually pertains to the pharmaceutical industry, the agency possesses much of that information only because pharmaceutical companies have furnished it voluntarily. *See* JA 78 ("The rule is limited to the pharmaceutical industry because the PNO has not received filings over the past five years for exclusive patent licensing arrangements in other industries and requests for guidance on the treatment of exclusive patent licensing arrangements have nearly always come from practitioners in the pharmaceutical industry."). FTC admits that it has seen few of these transactions in other industries because no other industry has filed such transactions with the agency or sought guidance regarding them—not because the Commission has looked into the matter itself. *See* JA 77 ("Although it is possible for other industries to engage in the kind of exclusive licensing that typifies the pharmaceutical industry, the PNO has not processed filings related to these kinds of exclusive licenses in any other

industry in the past five years."). That, of course, says nothing about such transactions' frequency outside the pharmaceutical industry, but only that all (or at least most) persons voluntarily reporting them appear to be from the pharmaceutical industry.

Perhaps the pharmaceutical industry files more quickly and seeks more guidance because it knows that FTC has historically subjected the pharmaceutical industry to particularly intense scrutiny, and is therefore especially cautious.[16] Regardless, it is illogical to conclude that industries that most frequently seek agency guidance on antitrust compliance deserve more onerous regulation.[17] This is especially true where there is no evidence that FTC has ever found *any* pharmaceutical transaction involving patent licensing to be anticompetitive,

---

[16] *See, e.g.*, Horizontal Merger Data Fiscal Years 1996-2011, at 8-10, available at http://www.ftc.gov/sites/default/files/documents/reports/horizontal-merger-investigation-data-fiscal-years-1996-2011/130104horizontalmergerreport.pdf (Jan. 2013) (reporting that FTC launched 1,372 investigations from 1996 to 2011, that 1,055, or 77%, led to enforcement, and that during the same time period, there were 121 investigations in the pharmaceutical industry, 119 (98%) of which were enforced, suggesting that FTC is more inclined to enforce in the pharmaceutical industry); *see also* Remarks of Commissioner Julie Brill, Antitrust and Innovation: Rebalancing the Scale (Sept. 14, 2013), available at http://www.ftc.gov/sites/default/files/documents/public_statements/antitrust-and-innovation-rebalancing-scale/130914iba_0.pdf ("[I]n the United States, retail prescription drug expenditures are expected to total $483 billion by 2021. Thanks to the FTC's persistence and advocacy to promote pharmaceutical competition, this number will be lower.").

[17] FTC itself appreciates this point. JA 192 (admitting that the agency "would not expect parties to such transactions to invite antitrust scrutiny" by contacting FTC regarding their participation in the targeted transactions).

whether it was the subject of a guidance request or not.  FTC's Rule defies common sense, and the agency has made no meaningful attempt to create a record to justify and *explain* its decisions.  That failure alone defeats the Rule.

      3.    *FTC did not provide a meaningful response to the substantial problems with the Final Rule that Dr. Varner raised*

The Final Rule likewise cannot survive APA review because FTC offered no meaningful response to Dr. Varner's expert report.  Before promulgating a rule, an agency must respond to "substantial problems raised by commenters." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1149 (D.C. Cir. 2011).  Moreover, when a commenter's objections, if true, "would require a change in the proposed rule," an agency response is mandatory.  *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003).  Indeed, the "failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious." *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011).

Dr. Varner brought forward extensive data demonstrating that patent license agreements in a variety of industries involve the transfer of use and commercial rights but retained manufacturing rights.  JA 39-41.  FTC "d[id] not disagree" but nonetheless rejected Dr. Varner's report, suggesting that Dr. Varner had not provided examples of "exclusive patent licenses that transfer all rights to a patent or part of a patent but where the licensor retains rights to manufacture solely for the licensee."  JA 77.

But that is simply not true.  Dr. Varner cited licenses providing for *precisely* the sort of transfers that FTC purports to target.  For example, the Donlar-FMC license described on page 12 of his report concerned a license in the chemical industry that meets FTC's definition of a license that transfers all commercially significant rights.  Donlar Corporation licensed its biodegradable polyaspartic polymer technology to FMC Corporation "on an exclusive basis" and "retained the manufacturing rights."  JA 39.  The agreement explained that "DONLAR appoints FMC its sole and exclusive worldwide distributor for the sale of Products in the Field and FMC accepts such appointment."  *Id.* at n.34.  The Donlar-FMC license thus transferred all rights to the patent to FMC, and Donlar retained only the right to manufacture exclusively for FMC.  To similar effect, Dr. Varner described the Medi-Ject-BIG license, which had the same structure as Donlar-FMC.  *See* JA 40-41 & n.39.  Thus, Dr. Varner *did* provide examples of transactions in other industries that are precisely the same as those the Rule targets.

But even if FTC could dissect these transactions to find nominal distinctions between them and the exclusive patent licenses it claims to see so often in the pharmaceutical industry (but refuses to provide an example of), that would not save the Final Rule.  As FTC has said, both in this rulemaking and in past rules, it has always focused on "the substance of what is being transferred, not the form."  77 Fed. Reg. 50,057; JA 76 n.12 (noting that the "form of the transfer" is not "the

focus" of the Final Rule); 43 Fed. Reg. 33,488 ("[T]he Commission will apply the act and the rules to the substance rather than to the form of the transaction."). Even if there were some technical distinction between Dr. Varner's examples and those FTC has in mind, the agency has done *nothing* to explain how that difference bears on those transactions' relative likelihood of violating the antitrust laws when they arise in the pharmaceutical industry as opposed to others.  *Cf. SecurityPoint Holdings, Inc.*, No. 13-1068, Slip Op. at 7 (rejecting an agency's explanation that its decision was justified to protect the agency from legal liability because the agency failed to "suggest[] some reason why" it actually needed that protection).

Nor are we told why FTC can so comfortably assume that the precise exclusive patent transaction it condemns to antitrust notification in the pharmaceutical industry will not be proposed tomorrow by persons outside the pharmaceutical industry, or further why, on such an eventuality, FTC believes those persons are entitled to different treatment.  As this Court has explained, "we cannot defer, indeed we cannot even engage in meaningful review, unless we are told which factual distinctions . . . separate arguably similarly situated [parties], and why those distinctions are important."  *Pub. Media Ctr.*, 587 F.2d at 1331.  Similarly, PhRMA cannot adequately oppose a rationale that FTC will not divulge.  *See Nat'l Ass'n of Clean Water Agencies*, 734 F.3d at 1148 ("A purpose of notice-and-comment . . . is to ensure that affected parties have an opportunity to participate in and influence

agency decision making at an early stage, when the agency is likely to give real consideration to alternative ideas.") (internal quotation marks omitted).

FTC was fully aware of its obligation to provide a rational explanation for its decision to treat identical transactions differently depending on their industry of origin.  In the NPR, the agency initially attempted to meet that obligation by claiming that the pharmaceutical industry's incentive structure and its alleged lack of emphasis on manufacturing distinguished it from other industries.  *See* 77 Fed. Reg. at 50,059.  Confronted with Dr. Varner's expert report, however, FTC realized those arguments were indefensible and abandoned them.  *See* JA 77-78.  That leaves only FTC's unadorned assertions of agency "experience" and "expertise" and its unsupported—not to mention irrelevant—"prevalence" claim with respect to alleged frequency of the subject transaction's use in the pharmaceutical industry. That hardly measures up to the "reasoned analysis, resting on articulated objective, nondiscriminatory, and evenhanded criteria, that this Court demands to justify treating [persons in all other industries ] differently than [persons] in [the pharmaceutical industry]."  *W. Deptford Energy, LLC*, 766 F.3d at 21 (citation omitted).

## C.     This Court should vacate the Final Rule

A reviewing court "shall hold unlawful and set aside" a rule that does not comply with the APA's procedures.  5 U.S.C. § 706(2)(D).  Remand without vacatur is an extraordinary remedy used in instances where vacating an agency ac-

tion will severely disrupt an entire regulatory scheme. *North Carolina v. EPA*, 531 F.3d 896, 901 (D.C. Cir. 2008). "[T]he decision to remand or vacate hinges upon [the] court's assessment of the seriousness of the deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Chamber of Commerce*, 443 F.3d at 908 (internal citation and alteration omitted). Vacatur is appropriate here given the complete absence of either evidence or explanation to support its Final Rule. There is no reason to think that FTC could satisfy the APA on remand.

Vacatur poses no threat of disruption to the existing regulatory regime. Nor has FTC expressed any heightened antitrust concern over these transactions that would make ensuring their coverage imperative, much less a serious enough concern to justify remand without vacatur. *See, e.g.*, *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 151 (D.C. Cir. 1993) (declining to vacate a rule because doing so would require the agency to refund fees collected from customers and would prevent the agency from recovering those fees under a later-enacted rule). As FTC itself says, the same transactions will remain potentially reportable even in the absence of the Rule, so vacating it will leave no regulatory gap. Moreover, FTC retains the right to investigate any transaction—even those that are not reported— and yet FTC has never found any of the targeted transactions anticompetitive or demanded that any of them be unwound. Prejudice to FTC as a result of vacatur is

59

thus hard to imagine.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the judgment below.

Respectfully submitted,

/s/ Evan A. Young
Evan A. Young
BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Austin, TX 78701
(512) 322-2506

Aaron M. Streett
Shane Pennington
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Wm. Bradford Reynolds
Joseph A. Ostoyich
James F. Rill
Dated:  November 10, 2014
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., NW
Washington, DC 20004
(202) 639-7700

*Counsel for Appellant Pharmaceutical Research and Manufacturers of America*

60

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,715 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14-point Times New Roman Font.

/s/ Shane Pennington
Shane Pennington
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1340

*Counsel for Appellant*
*Pharmaceutical Research and Manu-*
*facturers of America*

Dated:  November 10, 2014

61

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 10, 2014, I served the foregoing Principal Brief for Appellant on counsel of record by electronic service through the CM/ECF system.

In addition, pursuant to D.C. Circuit Rule 31(b) and this Court's Administrative Order Regarding Electronic Case Filing, I will cause to be mailed to the Court eight paper copies of this brief within two business days of this filing.

<u>/s/ Shane Pennington</u>
Shane Pennington
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1340

*Counsel for Appellant*
*Pharmaceutical Research and Manu-*
*facturers of America*

**ADDENDUM**

## ADDENDUM CONTENTS

**<u>Page</u>**
**<u>USC</u>**

15 U.S.C. § 18a ...........................................................................A1

**<u>CFR</u>**

16 C.F.R. § 801.1(o) ........................................................A7

16 C.F.R. § 801.1(p) ........................................................A7

16 C.F.R. § 801.1(q) ........................................................A7

16 C.F.R. § 801.2(g) ........................................................A8

## 15 U.S.C. §18a. Premerger notification and waiting period

Congress finds that—

(a) Filing

Except as exempted pursuant to subsection (c) of this section, no person shall acquire, directly or indirectly, any voting securities or assets of any other person, unless both persons (or in the case of a tender offer, the acquiring person) file notification pursuant to rules under subsection (d)(1) of this section and the waiting period described in subsection (b)(1) of this section has expired, if

> **(1)** the acquiring person, or the person whose voting securities or assets are being acquired, is engaged in commerce or in any activity affecting commerce; and

> **(2)** as a result of such acquisition, the acquiring person would hold an aggregate total amount of the voting securities and assets of the acquired person--

>> **(A)** in excess of $200,000,000 (as adjusted and published for each fiscal year beginning after September 30, 2004, in the same manner as provided in section 19(a)(5) of this title to reflect the percentage change in the gross national product for such fiscal year compared to the gross national product for the year ending September 30, 2003); or

>> **(B)(i)** in excess of $50,000,000 (as so adjusted and published) but not in excess of $200,000,000 (as so adjusted and published); and

>> **(ii)(I)** any voting securities or assets of a person engaged in manufacturing which has annual net sales or total assets of $10,000,000 (as so adjusted and published) or more are being acquired by any person which has total assets or annual net sales of $100,000,000 (as so adjusted and published) or more;

>> **(II)** any voting securities or assets of a person not engaged in manufacturing which has total assets of $10,000,000 (as so adjusted and published) or more are being acquired by any person which has total assets or annual net sales of $100,000,000 (as so adjusted and published) or more; or

>> **(III)** any voting securities or assets of a person with annual net sales or total assets of $100,000,000 (as so adjusted and published) or more are being acquired by any person with total assets or annual net sales of $10,000,000 (as so adjusted and published) or more.

In the case of a tender offer, the person whose voting securities are sought to be acquired by a person required to file notification under this subsection shall file notification pursuant to rules under subsection (d) of this section.

(b) Waiting period; publication; voting securities

**(1)** The waiting period required under subsection (a) of this section shall--

> **(A)** begin on the date of the receipt by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice (hereinafter referred to in this section as the "Assistant Attorney General") of--
>
> > **(i)** the completed notification required under subsection (a) of this section, or
> >
> > **(ii)** if such notification is not completed, the notification to the extent completed and a statement of the reasons for such noncompliance, from both persons, or, in the case of a tender offer, the acquiring person; and
>
> **(B)** end on the thirtieth day after the date of such receipt (or in the case of a cash tender offer, the fifteenth day), or on such later date as may be set under subsection (e)(2) or (g)(2) of this section.

**(2)** The Federal Trade Commission and the Assistant Attorney General may, in individual cases, terminate the waiting period specified in paragraph (1) and allow any person to proceed with any acquisition subject to this section, and promptly shall cause to be published in the Federal Register a notice that neither intends to take any action within such period with respect to such acquisition.

**(3)** As used in this section--

> **(A)** The term "voting securities" means any securities which at present or upon conversion entitle the owner or holder thereof to vote for the election of directors of the issuer or, with respect to unincorporated issuers, persons exercising similar functions.
>
> **(B)** The amount or percentage of voting securities or assets of a person which are acquired or held by another person shall be determined by aggregating the amount or percentage of such voting securities or assets held or acquired by such other person and each affiliate thereof.

(c) Exempt transactions

The following classes of transactions are exempt from the requirements of this section--

> **(1)** acquisitions of goods or realty transferred in the ordinary course of business;
>
> **(2)** acquisitions of bonds, mortgages, deeds of trust, or other obligations which are not voting securities;

**(3)** acquisitions of voting securities of an issuer at least 50 per centum of the voting securities of which are owned by the acquiring person prior to such acquisition;

**(4)** transfers to or from a Federal agency or a State or political subdivision thereof;

**(5)** transactions specifically exempted from the antitrust laws by Federal statute;

**(6)** transactions specifically exempted from the antitrust laws by Federal statute if approved by a Federal agency, if copies of all information and documentary material filed with such agency are contemporaneously filed with the Federal Trade Commission and the Assistant Attorney General;

**(7)** transactions which require agency approval under section 1467a(e) of title 12, section 1828(c) of title 12, or 1842 of Title 12, except that a portion of a transaction is not exempt under this paragraph if such portion of the transaction (A) is subject to section 1843(k) of Title 12; and (B) does not require agency approval under section 1842 of Title 12;

**(8)** transactions which require agency approval under section 1843 of title 12 or section 1464 of Title 12, if copies of all such information and documentary material filed with any such agency are contemporaneously filed with the Federal Trade Commission and the Assistant Attorney General at least 30 days prior to consummation of the proposed transaction, except that a portion of a transaction is not exempt under this paragraph if such portion of the transaction (A) is subject to section 1843(k) of Title 12; and (B) does not require agency approval under section 1843 of Title 12;

**(9)** acquisitions, solely for the purpose of investment, of voting securities, if, as a result of such acquisition, the securities acquired or held do not exceed 10 per centum of the outstanding voting securities of the issuer;

**(10)** acquisitions of voting securities, if, as a result of such acquisition, the voting securities acquired do not increase, directly or indirectly, the acquiring person's per centum share of outstanding voting securities of the issuer;

**(11)** acquisitions, solely for the purpose of investment, by any bank, banking association, trust company, investment company, or insurance company, of (A) voting securities pursuant to a plan of reorganization or dissolution; or (B) assets in the ordinary course of its business; and

**(12)** such other acquisitions, transfers, or transactions, as may be exempted under subsection (d)(2)(B) of this section.

(d) Commission rules

The Federal Trade Commission, with the concurrence of the Assistant Attorney General and by rule in accordance with section 553 of Title 5, consistent with the purposes of this section--

> **(1)** shall require that the notification required under subsection (a) of this section be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws; and

> **(2)** may--

>> **(A)** define the terms used in this section;

>> **(B)** exempt, from the requirements of this section, classes of persons, acquisitions, transfers, or transactions which are not likely to violate the antitrust laws; and

>> **(C)** prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section.

(e) Additional information; waiting period extensions

**(1)(A)** The Federal Trade Commission or the Assistant Attorney General may, prior to the expiration of the 30-day waiting period (or in the case of a cash tender offer, the 15-day waiting period) specified in subsection (b)(1) of this section, require the submission of additional information or documentary material relevant to the proposed acquisition, from a person required to file notification with respect to such acquisition under subsection (a) of this section prior to the expiration of the waiting period specified in subsection (b)(1) of this section, or from any officer, director, partner, agent, or employee of such person.

**(B)(i)** The assistant attorney general and the Federal trade Commission shall each designate a senior official who does not have direct responsibility for the review of any enforcement recommendation under this section concerning the transaction at issue, to hear any petition filed by such person to determine

> **(I)** whether the request for additional information or documentary material is unreasonably cumulative, unduly burdensome, or duplicative; or

> **(II)** whether the request for additional information or documentary material has been substantially complied with by the petitioning person.

**(ii)** Internal review procedures for petitions filed pursuant to clause (i) shall include reasonable deadlines for expedited review of such petitions, after reasonable negotiations with investigative staff, in order to avoid undue delay of the merger review process.

**(iii)** Not later than 90 days after December 21, 2000, the Assistant Attorney General and the Federal Trade Commission shall conduct an internal review and implement reforms of the merger review process in order to eliminate unnecessary burden, remove costly duplication, and eliminate undue delay, in order to achieve a more effective and more efficient merger review process.

**(iv)** Not later than 120 days after December 21, 2000, the Assistant Attorney General and the Federal Trade Commission shall issue or amend their respective industry guidance, regulations, operating manuals and relevant policy documents, to the extent appropriate, to implement each reform in this subparagraph.

**(v)** Not later than 180 days after December 21, 2000, the assistant attorney general and the Federal trade Commission shall each report to Congress

> **(I)** which reforms each agency has adopted under this subparagraph;

> **(II)** which steps each has taken to implement such internal reforms; and

> **(III)** the effects of such reforms.

**(2)** The Federal Trade Commission or the Assistant Attorney General, in its or his discretion, may extend the 30-day waiting period (or in the case of a cash tender offer, the 15-day waiting period) specified in subsection (b)(1) of this section for an additional period of not more than 30 days (or in the case of a cash tender offer, 10 days) after the date on which the Federal Trade Commission or the Assistant Attorney General, as the case may be, receives from any person to whom a request is made under paragraph (1), or in the case of tender offers, the acquiring person, (A) all the information and documentary material required to be submitted pursuant to such a request, or (B) if such request is not fully complied with, the information and documentary material submitted and a statement of the reasons for such noncompliance. Such additional period may be further extended only by the United States district court, upon an application by the Federal Trade Commission or the Assistant Attorney General pursuant to subsection (g)(2) of this section.

(f) Preliminary injunctions; hearings

If a proceeding is instituted or an action is filed by the Federal Trade Commission, alleging that a proposed acquisition violates section 18 of this title, or section 45 of this title, or an action is filed by the United States, alleging that a proposed acquisition violates such section 18 of this title, or section 1 or 2 of this title, and the Federal Trade Commission or the Assistant Attorney General (1) files a motion for a preliminary injunction against consummation of such acquisition pendente lite, and (2) certifies the United States district court for the judicial district within which the respondent resides or carries on business, or in which the action is brought, that it or he believes that the public interest requires relief pendente lite pursuant to this subsection, then upon the filing of such motion and certification,

the chief judge of such district court shall immediately notify the chief judge of the United States court of appeals for the circuit in which such district court is located, who shall designate a United States district judge to whom such action shall be assigned for all purposes.

(g) Civil penalty; compliance; power of court

**(1)** Any person, or any officer, director, or partner thereof, who fails to comply with any provision of this section shall be liable to the United States for a civil penalty of not more than $10,000 for each day during which such person is in violation of this section. Such penalty may be recovered in a civil action brought by the United States.

**(2)** If any person, or any officer, director, partner, agent, or employee thereof, fails substantially to comply with the notification requirement under subsection (a) of this section or any request for the submission of additional information or documentary material under subsection (e)(1) of this section within the waiting period specified in subsection (b)(1) of this section and as may be extended under subsection (e)(2) of this section, the United States district court--

> **(A)** may order compliance;

> **(B)** shall extend the waiting period specified in subsection (b)(1) of this section and as may have been extended under subsection (e)(2) of this section until there has been substantial compliance, except that, in the case of a tender offer, the court may not extend such waiting period on the basis of a failure, by the person whose stock is sought to be acquired, to comply substantially with such notification requirement or any such request; and

> **(C)** may grant such other equitable relief as the court in its discretion determines necessary or appropriate, upon application of the Federal Trade Commission or the Assistant Attorney General.

(h) Disclosure exemption

Any information or documentary material filed with the Assistant Attorney General or the Federal Trade Commission pursuant to this section shall be exempt from disclosure under section 552 of Title 5, and no such information or documentary material may be made public, except as may be relevant to any administrative or judicial action or proceeding. Nothing in this section is intended to prevent disclosure to either body of Congress or to any duly authorized committee or subcommittee of the Congress.

(i) Construction with other laws

**(1)** Any action taken by the Federal Trade Commission or the Assistant Attorney General or any failure of the Federal Trade Commission or the Assistant Attorney General to take any action under this section shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of law.

**(2)** Nothing contained in this section shall limit the authority of the Assistant Attorney General or the Federal Trade Commission to secure at any time from any person documentary material, oral testimony, or other information under the Antitrust Civil Process Act [15 U.S.C.A. § 1311 et seq.], the Federal Trade Commission Act [15 U.S.C.A. § 41 et seq.], or any other provision of law.

(j) Omitted

(k) Computation of time

If the end of any period of time provided in this section falls on a Saturday, Sunday, or legal public holiday (as defined in section 6103(a) of title 5), then such period shall be extended to the end of the next day that is not a Saturday, Sunday, or legal public holiday.

## 16 C.F.R. § 801.1(o)

(o) All commercially significant rights. For purposes of paragraph (g) of § 801.2, the term all commercially significant rights means the exclusive rights to a patent that allow only the recipient of the exclusive patent rights to use the patent in a particular therapeutic area (or specific indication within a therapeutic area).

## 16 C.F.R. § 801.01(p)

(p) Limited manufacturing rights. For purposes of paragraph (o) of this section and paragraph (g) of § 801.2, the term limited manufacturing rights means the rights retained by a patent holder to manufacture the product(s) covered by a patent when all other exclusive rights to the patent within a therapeutic area (or specific indication within a therapeutic area) have been transferred to the recipient of the patent rights. The retained right to manufacture is limited in that it is retained by the patent holder solely to provide the recipient of the patent rights with product(s) covered by the patent (which either the patent holder alone or both the patent holder and the recipient may manufacture).

## 16 C.F.R. § 801.1(q)

(q) Co-rights. For purposes of paragraph (o) of this section and paragraph (g) of § 801.2, the term co-rights means shared rights retained by the patent holder to assist the recipient of the exclusive patent rights in developing and

A7

commercializing the product covered by the patent. These co-rights include, but are not limited to, co-development, co-promotion, co-marketing and co-commercialization.

### 16 C.F.R. § 801.2(g)

(g) Transfers of patent rights within NAICS Industry Group 3254.

> (1) This paragraph applies only to patents covering products whose manufacture and sale would generate revenues in NAICS Industry Group 3254, including:

325411 Medical and Botanical Manufacturing

325412 Pharmaceutical Preparation Manufacturing

325413 In–Vitro Diagnostic Substance Manufacturing

325414 Biological Product (except Diagnostic) Manufacturing

> (2) The transfer of patent rights covered by this paragraph constitutes an asset acquisition; and

> (3) Patent rights are transferred if and only if all commercially significant rights to a patent, as defined in § 801.1(o), for any therapeutic area (or specific indication within a therapeutic area) are transferred to another entity. All commercially significant rights are transferred even if the patent holder retains limited manufacturing rights, as defined in § 801.1(p), or co-rights, as defined in § 801.1(q).

Examples: Although these examples refer to licenses, which are typically used to effect the transfer of pharmaceutical patent rights to a recipient of those rights, other methods of transferring patent rights, by assignment or grant, among others, are similarly covered by these rules and examples.

1. B holds a patent relating to an active pharmaceutical ingredient for cardiovascular use. A will obtain a license from B that grants A the exclusive right to all of B's patent rights except that both A and B can manufacture the active pharmaceutical ingredient to be sold by A under the exclusive license agreement. B retains limited manufacturing rights as defined in § 801.1(p) because it retains the right to manufacture the product covered by the patent for cardiovascular use solely to provide the product to A.   A is still receiving all commercially significant rights to the patent, and the transfer of these rights via the license constitutes an asset acquisition. Further, even if B retained all rights to manufacture (so that A could not manufacture), B would still retain limited manufacturing rights, and A would still receive all commercially significant rights to the patent. Thus, the transfer of these rights via the license would also constitute an asset acquisition.

2. B holds a patent for an in-vitro diagnostic substance relating to arthritis. B will grant A an exclusive license to all of B's patent rights for all veterinary indications. B retains all patent rights for all human indications. The exclusive license to all commercially significant rights for all veterinary indications is an asset acquisition because A is receiving all rights to the patent for a therapeutic area.

3. B holds a patent relating to a biological product. B will grant A an exclusive license to all of B's patent rights in all therapeutic areas. A and B are also entering into a co-development and co-commercialization agreement under which B will assist A in developing, marketing and promoting the product to physicians. B cannot separately use the patent in the same therapeutic area as A under the co-development and co-commercialization agreement. A will book all sales of the product and will pay B a portion of the profits resulting from those sales. Despite B's retention of these co-rights, A is still receiving all commercially significant rights. The licensing agreement is an asset acquisition. This would be an asset acquisition even if B also retained limited manufacturing rights.

4. B holds a patent relating to an active pharmaceutical ingredient and a bulk compound that contains that active pharmaceutical ingredient. B will grant A an exclusive license to use the bulk compound to manufacture and sell a finished product in the neurological therapeutic area. B cannot manufacture the active pharmaceutical ingredient or bulk compound for any other finished products in the neurological area, but it can manufacture either for use by another party in a different therapeutic area. Despite B's retention of manufacturing rights of the active pharmaceutical ingredient and bulk compound for therapeutic areas other than neurology, A is still receiving all commercially significant rights in a therapeutic area and the licensing agreement is the acquisition of an asset.

5. B holds a patent related to a pharmaceutical product that has been approved by the FDA. B will enter into an exclusive distribution agreement with A that will give A the right to distribute the product in the U.S. B will manufacture the product for A and will receive a portion of all revenues from the sale of the product. A receives no exclusive patent rights under the distribution agreement. A has not obtained all commercially significant rights to the patent because it is only handling the logistics of selling and distributing the product on B's behalf. Therefore, the exclusive distribution agreement is not an asset acquisition.

A9